## ALLEN v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1902.)

No. 737.

1. CRIMINAL LAW—TRIAL—PREJUDICIAL REMARKS OF COURT AND COUNSEL.
   Defendant in a criminal case filed a motion for continuance on the ground of the absence of a witness, supported by the affidavits of himself and his counsel setting out the facts to which the witness would testify if present. The district attorney refused to admit that the wit-

ness would so testify on the ground that the wife of the witness had told him that defendant's attorney had tried to get her husband to give such testimony, but that the same was not true. This statement by the district attorney was corroborated by the presiding judge as a matter of personal knowledge, the remarks of both being made in open court in the presence of the jurors, and the continuance was denied. Subsequently the court refused to permit defendant's counsel to renew his motion, or to read an affidavit made by the wife of the absent witness in which she denied having made the statement attributed to her, and deposed that her husband had told her that the facts were as set out in the affidavits of defendant and his counsel. *Held*, that the remarks of the attorney and court, reflecting, as they did, upon both defendant and his attorney, and going to the jurors unchallenged, were calculated to unduly prejudice them against defendant, and to prevent him from having a fair and impartial trial, and constituted reversible error.

**2. SAME—REVIEW ON APPEAL—EXCEPTIONS.**

The failure of a defendant to except to prejudicial remarks made by court or counsel will not preclude him from having the same reviewed on appeal, where they were the basis of a subsequent offer of evidence tending to cure their effect, the refusal to receive which was duly excepted to.

**3. SAME—REMARKS MADE BEFORE IMPANELING OF JURY.**

The prejudicial effect of remarks made by court or counsel, and heard by the jurors who tried the case, is not lessened nor affected by the fact that the jury had not then been impaneled.

**4. SAME—EVIDENCE—PREVIOUS GENERAL CHARACTER AND CONDUCT OF DEFENDANT.**

On the cross-examination of a defendant charged with robbery the district attorney was permitted to question him at great length as to his conduct during his whole life at various places; his habits; the amounts of money he had received; from whom he received it, and how he spent it; whether he did not hang around saloons and gambling houses, etc. The questions were not asked for purposes of impeachment, his testimony being uncontradicted, but were admitted, as stated by the court, for the purpose of showing the habits and character of the defendant prior to the time of the alleged offense. *Held*, that such examination was irrelevant, unfair, and clearly prejudicial and erroneous, its only purpose and effect being to degrade defendant in the eyes of the jury.

**5. ROBBERY—INDICTMENT—VARIANCE.**

There is no substantial variance between an indictment for robbery which describes the property taken as "pieces of paper money of the dominion of Canada" of stated denominations and value, and evidence showing that the bills taken were issued either by the dominion of Canada or by banks chartered by the Canadian government circulating as money in the dominion.

In Error to the District Court of the United States for the District of Alaska, Second Division.

In order to fully understand the conditions as to the trial of this case, which are presented in the bill of exceptions, it will be necessary to make a lengthy statement of the facts.

The plaintiff in error is a young man of the age of 21 years. On January 22, 1901, he was indicted in the district court for the district of Alaska, division No. 2, of the crime of robbery, committed as follows: "The said George Allen * * * on the 21st day of December, nineteen hundred, in the district aforesaid, did wrongfully, unlawfully, and feloniously take, steal, and carry away from the person of R. J. Embleton, and against his will, and by force and violence to his person, the following described personal property, namely: One piece of paper money of the dominion of Canada, of the denomination and value of one hundred dollars; two pieces of paper money of the dominion of Canada, each of the denomination and valuation of fifty

dollars; four pieces of paper money of the dominion of Canada, each of the denomination and value of twenty dollars; one piece of paper money of the dominion of Canada, of the denomination and value of ten dollars,—a more particular description of each or any of said pieces of paper money aforesaid being to the grand jury unknown; also one gold watch, of the value of seventy-five dollars," etc.

The case was called for trial February 11th. The clerk first called the roll of trial jurors. The district attorney then announced that the United States was ready for trial. Mr. Fink, counsel for the defendant, said: "If the court please, we move for the continuance of the case of the United States v. Allen on the ground of the absence of a material and important witness, Thomas Noyes, who is commissioner for the Fair Haven mining district, and we support the motion by an affidavit of Mr. Allen, and an affidavit by myself to the effect that Mr. Noyes stated to me just before he left that he expected to be back in about three weeks; that since his departure the defendant has been indicted, arraigned, and his case set for trial; that it is impossible, owing to the condition that prevails in this country, to reach him; and that he is expected back in about a week, if the travel will permit him. We set up in the affidavits facts to which Mr. Noyes will testify if present, and would say, in conclusion, that we don't want to postpone the case except for that reason, and if those facts won't become material on the trial of the case we would be perfectly willing to proceed to-day. The facts are that he gave Mr. Allen about one hundred dollars on the morning of the 21st of December to play faro with, and that he would so testify if present. If the district attorney would admit that Mr. Noyes, if present, would testify as set out in the affidavit, we would be perfectly willing to proceed with the trial; otherwise not."

Counsel then read in support of his motion for continuance the affidavits of George Allen and Mr. Fink, setting forth the facts substantially as stated in the remarks of counsel to the court.

The proceedings which were had at that time, as set forth in the record, are as follows: "The trial jurors being in attendance, the jury not yet being impaneled, Mr. J. K. Wood, district attorney, stated: 'If the court please, I deem it is my duty to the court when called upon to admit a statement of that kind, and I say this officially, what has come to my knowledge from a source that is almost indisputable in its nature, and that is this: that Mrs. Noyes, the wife of Tom Noyes, stated that the counsel for the defense wanted Tom Noyes to swear that he * * * gave George Allen money to play faro, but that he didn't do it. Now, those matters have come to my knowledge officially, in a way that can't be disputed, and under those circumstances and conditions, so far as admitting it is concerned, I wouldn't be doing my duty if I did. It is simply upon that proposition as to whether they are entitled under the affidavit or not, even if that were undisputed. Why, of course, when that proposition of the case comes up, I am willing to discuss it." Mr. Fink then said: "I don't care about getting into a discussion of that kind with the district attorney at this time; that the district attorney is misinformed. I don't know what his source of information is. The Court: It happened that the statement was made in the presence of Mrs. Noyes and myself by Mrs. Noyes. Mr. Fink: I expect the court misunderstood Mrs. Noyes, because, from a conversation that I had with Mrs. Noyes on the street the other day, Mrs. Noyes stated to me that Tom Noyes didn't want to testify to these facts, not because they didn't happen, but because he didn't want it known that he was playing faro. The Court: We will go on with the case. If it becomes material on the trial at a later time, it will not be so far beyond the power of the court to rectify it, and will not put this defendant in jeopardy at all. * * * Mr. Fink: Our motion is then overruled? The Court: Overruled. Mr. Fink: Exception."

The examination of the trial jurors was then commenced, and the jury partially completed during the morning hour. Upon the court convening at 2 p. m., counsel for the defendant addressed the court as follows: "Mr. Fink: If the court please, I am sorry that the district attorney saw fit to level an accusation at me this morning in open court, especially so when I find that there was absolutely no basis for the accusation at all. Now, we

offer to the court at this time, in refutation of the statement made by the district attorney this morning, the affidavit of Mrs. Tom Noyes, which is as follows: (Mr. Fink thereupon commenced to read the said affidavit.) Mr. Wood, District Attorney (interrupting): It has no place in this court at this time. The Court: That is the order of this court. * * * You may file your affidavit, and when the time comes, if there is any occasion for your using it, you can use it then. Mr. Fink: We except to the ruling of the court, and we now ask to renew the motion for a continuance on the ground alleged in the affidavits this morning and on this additional affidavit. The Court: Denied. Mr. Fink: Exception."

The affidavit of Mrs. Tom Noyes, referred to by counsel, reads as follows: "Mrs. Thomas Noyes, being first duly sworn, deposes and says: That she was told by her husband, Thomas Noyes, that on the morning that R. J. Embleton was held up or robbed he had given to one George Allen a certain amount of money, the exact amount of which affiant does not remember, with which to play cards. Affiant further says that she did not state to the district attorney, Joseph K. Woods, or to any other person at any time, that Mr. Albert Fink, counsel for George Allen, had approached the said Tom Noyes with view of procuring the said Thomas Noyes to testify to a state of facts which were not true, nor did she say anything from which such an inference might be drawn; but affiant further avers that she did say in the presence of said Joseph K. Woods, district attorney, that said Albert Fink had asked her husband, the said Thomas Noyes, to testify in the case of the United States v. George Allen, and that the said Thomas Noyes had agreed to testify that he had given the said George Allen some money to play cards with, as aforesaid, that ' ving the truth. [Signed] Mrs. Thomas Noyes."

During the trial Mr. Embleton testified, among other things, that on the 21st day of December, between 2 and 3 o'clock, he was assaulted and robbed of everything; that he probably had nearly $300. "I know of one lot I had of two hundred and eighty-one dollars and fifty cents that was separate. There was one hundred dollar bill, two fifties, four twenties, and a ten. * * * It was all Canadian money. I also had a gold watch and chain. I have that with me now. * * * It had a chain on it. Lost the chain there somewhere. The watch was in my pocket, and the chain fastened to the button-holes. * * * I know absolutely nothing of what happened on that Friday night, and I didn't realize or remember the shock of the blow until Monday or Tuesday of the next week." He then described how he was knocked senseless, and the effect of the blows that he had received. On his cross-examination he testified, among other things, as follows: "Q. by Mr. Fink: * * * This one hundred dollar bill, was that on the Canadian Bank of Commerce, if you remember? A. Well, I couldn't say. I know that it was all Canadian money. Q. All you know is that it was on some of the Canadian banks? A. Yes, sir. Q. Do you remember whether or not it had 'Yukon' stamped in big red letters down the face? A. I don't remember. Q. The two fifty-dollar bills, do you remember on what Canadian bank they were drawn? A. Oh, I didn't make any note of the bills. Q. The two twenty dollar bills and the ten dollar bills, do you remember on what Canadian bank they were drawn? A. No, I do not; I simply know the Canadian money from its appearance. * * * Q. So, then, the money that was taken from your person was a one hundred dollar bill, two fifty dollar bills, four twenties, and two ten dollar bills? A. Yes, sir; I can describe that, because I only recollect the kinds of money, but not the denominations of it. * * * Q. And these bills were all bills purporting to be drawn on some Canadian banks, the names of which you don't remember? A. From their general appearance they were drawn— They were Canadian money,—Canadian bills. Q. Canadian bank bills? A. Yes, sir." This witness further stated that the money taken from him was money he had collected as agent of the N. A. T. & T. Co., and designated the parties from whom he had received it. During the cross-examination the following proceedings were had: "Q. by Mr. Fink: I want to ask you, Mr. Embleton, if it is not a fact that you sometimes become so intoxicated that you remember absolutely nothing of what transpired before the time— Mr. Wood: Objected to as incompetent, irrelevant, and immaterial, and serving no purpose

in this case except the purpose of endeavoring to prejudice the minds of the jury against the witness. Mr. Fink: I will say right here, if the court please, that we have no desire or intention whatever of endeavoring to prejudice the minds of the jury against Mr. Embleton. * * * The Court: The question is the condition he was in that night. Mr. Fink: The condition that he was in on that night and as to his habits bearing on that condition. The Court: Objection sustained. Mr. Fink: Exception."

R. E. Trengrove, a witness produced on behalf of the defendant, testified that he was an assayer, and had been employed in the Bank of Cape Nome, and that during the time he had worked in the bank he had handled bank notes. The following testimony was then given: "You know a Canadian bank note when you see it? A. Yes, sir. Q. Do you know the paper money issued by the dominion of Canada when you see it? A. Yes, sir. Q. Is there any difference or distinction between those two kinds of money? A. Well, the money issued by the dominion of Canada is issued by the government, and the other bills are issued by the banks,—the provincial banks. Q. Is there any difference in the reading of the notes or pieces of paper? A. Well, one reads 'Dominion of Canada,' and the other reads by the bank it is issued by. Q. What are the provincial banks whose notes circulate in this country? A. There is the Bank of British North America, Canadian Bank of Commerce, I believe are about the principal banks. Q. I will ask if you have with you any notes of the Canadian Bank of Commerce or the Bank of British North America? A. Yes, sir. Q. Just produce them, please. (Witness handed bank notes to Mr. Orton, counsel for defendant.) Q. by Mr. Orton: Have you any notes,—have you any paper money issued by the dominion of Canada? A. Yes, sir. Q. Just show those to the district attorney. (Witness hands bank notes and paper money to the district attorney, Joseph K. Wood.) Q. Now, if your honor please, would show them to the court (handing same to the court). Q. We offer in evidence these four notes,—four pieces of paper money,—and the two pieces of paper of Canadian money, and the two bank notes. Mr. McGinn, of Prosecution: That is objected to as incompetent, irrelevant, and immaterial. * * * The indictment charges that it is paper money of the dominion of Canada. We contend as a matter of law it don't make any difference whether they are issued by the dominion of Canada or any of the banks of the dominion of Canada, just so long as they are lawful money of the dominion of Canada, and it is current money of the dominion of Canada. It can be considered pieces of paper,—paper money of the dominion of Canada. It is wholly immaterial. (Mr. Orton thereupon read the indictment to the court.) The Court: I won't take up the time of the court, because it doesn't make any difference— Mr. Orton, of Defendant's Counsel: I wanted to read your honor an authority— The Court (interrupting): You may take a ruling. You will have an exception if I am wrong. Less description required in an indictment describing money than any other kind of property taken. Mr. Fink: We have the supreme court of the United States to the contrary. The Court: All right; you will have the benefit of it. Mr. Fink then offered them in evidence. The Court: Denied. Mr. Orton: Exception. Mr. Orton: * * * Now, if the court please, permit an interruption just at this time. This evidence being denied, I will also move that your honor now strike from the record all the evidence given by Mr. Embleton with reference to the Canadian bank bills taken from his person, upon the ground that there is a variance between that testimony and the allegations of the indictment. The Court: Motion denied. Mr. Fink: Exception."

' Upon his cross-examination defendant was compelled, against the objection of his counsel, to answer questions in relation to his conduct during his whole life at various places, his habits at Nome, to give the amount of money he had received, from whom he had obtained it, for what purpose he had used it, etc. This character of testimony was admitted for the purpose, as stated by the court, of showing the habits and character of the defendant prior to the time of the alleged offense specified in the indictment. The cross-examination on these points covers 30 pages of the printed record. Among other things, he was called on to answer whether or not,

in the year 1897, he had any trouble in Skaguay, and whether his mother did not come to Skaguay because of some trouble he had had, and came there for the purpose of taking him home. For the purpose of showing the general character of many of the questions we quote from the record: "Q. What work have you done since you came to Alaska? Mr. Fink: Objected to as privileged, * * * and not proper cross-examination. The Court: He may answer this question, but I am not going to allow you to go into minute details of everything this man has done since he came to Alaska. Mr. Wood: It is what he has not done, your honor. Mr. Fink: I take exception to counsel's remarks. The Court: Proceed with the question. * * * A. I have not done much of any work. * * * Mr. Wood: You have been gambling, as a matter of fact, have you not? A. * * * I have played few dollars now and then, but I don't really consider that that is gambling, in the sense you mean. Q. Well, how have you earned your living since you have been here? A. I have not earned my living. * * * Q. How did you get your living, if you didn't earn it, then? A. I got it from home. Q. How much money did you get from home? A. * * * What I have had from home * * * amounted to something like three hundred dollars. Q. When did you get this money? A. * * * Part of it I got in October, and part of it in November. * * * Q. How much did you get in October? A. * * * There was about $150 I got from the bank here, but I could not tell you now whether it was in October or November that I got it. * * * Q. Well, now, did you get any from any person else besides the bank? A. I got seventy-five dollars returned to me at the close of navigation, the price of a first-class ticket, when I got left on the lighter out here in the bay. * * * Q. Where did you get that from? * * * Mr. Fink: We object, if the court please, to this examination. It is burdening the record. He says it was the money that was returned for a first-class ticket. I don't see what difference it makes where it came from. The Court: Overruled. Mr. Fink: Exception. * * * Q. What did you do with that money? A. I used it. Mr. Fink: Objected to as * * * immaterial to any issue here. The Court: Overruled. What is your answer? A. I used it. Q. How did you use it? A. * * * I used it to live on,—paid my board and room rent. * * * Q. Did you use it all to live with? Mr. Fink: Objected to for the same reasons, * * * and not cross-examination. The Court: Objection overruled. You may have your objection and exception to all this line of examination, but the witness will be allowed to testify to what money he has had, and what he has done with it since he has been in Nome, as tending to show his habits and character in Nome here during the summer. One objection and exception to it all will avail you the same as a dozen, and you may take that now. Mr. Orton: We take exception. * * * Q. Do you remember the boat that carried out some vagrants last fall? A. Yes, sir. Q. Did you have any money on your person at that time? A. I did. * * * Q. How much? A. I don't know. * * * Q. Do you know where the rest of the money went? * * * Gambled it, didn't you? A. I may have gambled some of it, yes; but not all of it. * * * Q. Well, you were broke at the time the boats went out,—from the time the boats went out until the 1st of January,—were you not? * * * A. I might not have had any money on my person, but I have always had some money where I could go and get it if I did not have any with me. * * * Q. Is it not a fact that you have spent the most of your time since fall and since you have been here hanging around saloons and gambling layouts? Mr. Orton: Defendant objects on the ground that it is immaterial, irrelevant, and incompetent, and does not affect the issues in this case. Counsel for defendant argued that evidence showing general bad character of the defendant was inadmissible; that he could only be impeached by showing that he had previously been convicted of a felony, or, having offered himself as a witness, by showing that his general reputation for truth and veracity was bad. The Court: Objection overruled. Mr. Orton: Exception. * * * A. I don't think I have done any particular hanging around. I have been in the gambling houses and saloons a good many times, but I would not begin to say that I had spent most of my time; no."

W. H. Metson, John B. Allen, Albert Fink, and Ira D. Orton, for plaintiff in error.

Jos. K. Wood and Marshall B. Woodworth, U. S. Attys.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after stating the facts as above, delivered the opinion of the court.

We are of opinion that the facts of this case are of such a character as to render it unnecessary to notice specifically each assignment of error under separate heads. The material ones can be grouped together and considered under one general question, did the defendant have a fair and impartial trial, free from bias or undue prejudice?

At the very threshold of this case we are called upon to review the action of the court as set forth in the statement of facts in refusing to grant the continuance. The question is not whether the court erred in refusing to grant the continuance, but the point involved relates to the remarks made by the United States attorney and by the court in the morning, and the refusal of the court to allow the affidavit of Mrs. Noyes to be read in the afternoon. The remarks were well calculated, if not intended, to cast an imputation, not only upon the defendant, but also upon his counsel. The inference to be drawn therefrom was that both of them had attempted to procure a witness to testify to a falsehood, and that they had each subscribed to an affidavit that they knew was untrue.

The error in the remarks might, perhaps, have been cured if the court had permitted the counsel, in the presence of the jury, to read the affidavit of Mrs. Noyes. This would, to some extent at least, have removed the poison of prejudice from the minds of the jury. This refusal left the sting in full force, and placed Allen and his counsel under suspicion at the very outset of the trial. The remarks of the defendant's counsel in the forenoon were respectful in tone, and, with the affidavits, prima facie presented the question of continuance in a favorable light for the careful consideration of the court. The remarks of the United States attorney were calculated to cast reflection upon defendant and his counsel, and the remarks of the court emphasized this reflection.

It is, however, claimed that the defendant is not in a position to raise this question, because the record shows that no exception was taken to the remarks. The answer to this is that the remarks constituted the subject-matter of the proceedings had in the afternoon, and were the basis of the renewal of the motion for the continuance and to the ruling of the court. To this ruling counsel did duly except. This exception, under the circumstances, must be deemed sufficient to warrant a review of all the proceedings had in this matter.

But it is said that the remarks were made before the jury was impaneled. This makes no difference. They were made in the presence of all the jurors. It matters not, therefore, whether they were in the jury box or outside the railing of the court room. There is no pretense that the jurors present did not hear the remarks. The

chair or bench upon which they were seated does not control the question. The remarks of the court, if erroneous, had the same effect as an erroneous instruction given to the jury regularly impaneled. People v. Bonds, 1 Nev. 33, 36; Sullivan v. People, 31 Mich. 1, 5; State v. Philpot, 97 Iowa, 366, 371, 66 N. W. 730; State v. Stowell, 60 Iowa, 535, 15 N. W. 417; 21 Enc. Pl. & Prac. 995, and authorities there cited.

In State v. Stowell, supra, the court overruled, in the presence of the jury, objections of defendant's counsel as to the admissibility of certain evidence, and gave an expression as to his opinion of the evidence. The court in reviewing this matter said:

"We are not prepared to admit the court, under the guise of determining some question which is legitimately before it, can make remarks in the presence and hearing of the jury which would constitute error if contained in an instruction, but because they are not it must be held the defendant is not prejudiced."

That the action of the court was erroneous is to our minds plain, and is well settled by authority based on sound and substantial reasons.

In Bowman v. State, 19 Neb. 523, 526, 28 N. W. 1, 2, 56 Am. Rep. 750, which was an application for a continuance made before the trial, where the jurors were present in court who afterwards sat upon the case, the presiding judge remarked that "said affidavit was false; that defendant's father had told him that he would have nothing to do with him, the defendant; that the defendant had committed perjury; and that a grand jury would be called to investigate the same on the 22d day of the following month." There the jurors upon their voir dire each stated that they were present, heard and still remembered the remarks of the court or presiding judge, but each denied any knowledge of the guilt or innocence of the accused, having formed or expressed any opinion of his guilt or innocence, or having any bias or prejudice for or against him. The court, among other things, said:

"The sole object for which men are selected and called to serve on juries is that the truth may be ascertained and declared upon the points in dispute between the parties. This truth must be ascertained, not from the previous knowledge or wisdom of the jurymen, but from the testimony of sworn witnesses. * * * For this purpose it is of the first importance that each juryman should enter the box as near as possible free of previously acquired knowledge, or of that which he believes to be, but which may or may not be, knowledge of the facts of the case. Also as free as possible of either knowledge or opinions of collateral facts calculated to either stimulate or retard the mind in the reception of either evidence or argument favorable to one party or the other to the controversy. * * * It may be granted that such declaration or expression of the court did not cause the future juror to form or express an opinion as to the guilt or innocence of the accused, but it did prevent him entering the box with his mind a tabula rasa so far as the guilt or innocence of the prisoner was concerned. * * * I come to the conclusion, therefore, that it was error on the part of the court to make in the presence of jurors of the regular panel the declarations and statements in regard to the defendant which he is shown to have made. The judgment of the district court is therefore reversed."

In People v. Moyer, 77 Mich. 571, 43 N. W. 928, there was a long and rambling cross-examination upon irrelevant matters having no other apparent purpose except to injuriously assail defendant's general

history. At the opening of the trial the prosecuting attorney said to the jury:

"One reason why I am more prejudiced against this man is because he has committed perjury in the recorder's court for the purpose of assisting one of his fellow prisoners."

Upon objection made by the defendant's counsel, the court, instead of rebuking the prosecuting attorney, said:

"I must say that considerable of that has come under my own notice. I don't see how you are going to deny that."

The appellate court, commenting on these remarks, said:

"The assertions of the prosecutor and their indorsement by the court are too plainly illegal to need comment. We have had occasion altogether too often to condemn the failure of justice brought about by the reckless conduct of officers whose sworn duty it is to conduct prosecutions legally and in conformity with settled principles. In some cases there is some apparent palliation in the excitement of a contested trial, although that does not obviate the mischief. But here the wrong was done in making the opening, and before any testimony was in, and when the prosecutor knew, or should have known, in advance what his case was to be, as he presented it. Nothing can bring more contempt and suspicion on the administration of justice than the failure of its ministers to respect justice."

See, also, People v. Willard, 92 Cal. 482, 490, 28 Pac. 585; People v. Wood, 126 N. Y. 249, 269, 27 N. E. 362.

From the cross-examination of the defendant, referred to in the statement of facts, it is apparent that the object of the prosecution was not solely for the purpose of bringing out facts that had any specific relation to the offense alleged against him. It was evidently not for the purpose of impeaching or discrediting him. No evidence was introduced for that purpose. No witness was called in rebuttal to deny the truth as to the answers given by the defendant, nor to support the insinuations contained in several of the questions. Of course, if the examination had been confined to these or like purposes, it would have been the duty of the court to have allowed great latitude in the cross-examination of this witness, and the questions allowed would have been largely within the reasonable discretion of the court. But the examination was not kept within these bounds. What was the object of these improper questions? What was the motive? Was it not for the purpose of degrading the defendant before the jury? Such was evidently the effect, whether so intended or not. What had the trouble at Skaguay, if any occurred, to do with the offense alleged at Nome for which the defendant was being tried? It was not even claimed that the "trouble" at Skaguay, if any, was of the same or similar kind or nature to the offense for which he was being tried. What would be the effect of calling upon the defendant to answer whether his mother went to Skaguay, on account of some trouble, to take him home? Its tendency was simply to degrade the witness in the eye of the jury. Such an examination was irrelevant, unjust, unfair, and clearly prejudicial. Take the character of his examination about money that he had received and expended, as well as of his habits, and bear in mind the fact that no attempt was made to show that the defendant had any amount of money immediately after the robbery, and the further fact that the court in refusing a continu-

ance had virtually deprived him of the opportunity of proving that he had been given $100 by Thomas Noyes with which to gamble, just previous to the alleged robbery, and add to this the further fact, which the record clearly shows, that the fact of the robbery and identity of the defendant depended alone upon the testimony of one witness, which was, to say the least, highly improbable, and in many respects unreasonable, and of such a peculiar character as to cast suspicion and raise a doubt as to its truth; do not the questions indicate the purpose for which they were asked as closely as the needle points to the pole? That it was for the purpose of showing that his habits were bad, and that he was a vagrant and a bad man, hanging around gambling resorts, and to endeavor to secure his conviction upon general principles, independent of the testimony offered as to his guilt or innocence, weak or strong as it might be.

All men stand equal before the law, and have the same constitutional rights and privileges. The high and the low, the poor and the rich, the criminal and the law abiding, when indicted and accused of crime, are entitled, under the law, to a fair and impartial trial. This is a sacred boon guarantied to every person, and of which no one should ever be deprived. The law, in its extended reach, power, and influence, is as tender of the rights of the man who is supposed to be bad as it is of the liberties and rights of the man who is believed to be good. The trial of every man should be free from undue prejudice or odium, especially upon the part of all officers clothed with the power and charged with the duty of administering the law in such a manner as to reach the ends of justice and of right.

As was said by Whitman, J., in State v. Pierce, 8 Nev. 291, 304:

"No technicality, except by the express letter of the law, should ever deprive an accused person of a substantial right. If * * * such rule confers in this special case a benefit on one unworthy, the answer is: The law knows no person; it is not made for the individual man, but for men. As the dew of heaven falls, so it bears alike upon the just and unjust."

Mr. Lawson, in his work on Presumptive Evidence (at page 481), declares the law in relation to the question we are discussing by propounding a question and answering it, as follows:

"Suppose the general character of one charged with crime is infamous and degraded to the last degree; that his life has been nothing but a succession of crimes of the most atrocious and revolting sort,—does not the knowledge of all this inevitably carry the mind in the direction of a conclusion that he has added the particular crime for which he is being tried to the list of those that have gone before? Why, then, should not the prosecutor be permitted to show facts which tend so naturally to produce a conviction of his guilt? The answer to all these questions is plain and decisive. The law is otherwise. It is the law that the prisoner shall be presumed innocent until his guilt is proved. This rule is said by Mr. Stephen (Steph. Dig. Ev. note 6, p. 195) to be one of the most characteristic and distinctive features of the English criminal law, preventing, as it does, a man charged with a particular offense from having either to submit to imputations which, in many cases, would be fatal to him, or else to defend every action of his own life in order to explain his conduct on the particular occasion when the act was committed with which he is charged. It is this rule which, perhaps, more than any other rule of our criminal law, distinguishes the American and English modes of conducting a criminal trial from the continental."

In U. S. v. Kenneally, 5 Biss. 122, Fed. Cas. No. 15,522, the court said:

"It is not competent for the prosecution to show, as a make-weight in the case,—as a part of the evidence for the prosecution in making out a prima facie case,—that the accused is a person of bad character."

In State v. Lapage, 57 N. H. 245, 289, 24 Am. Rep. 69, the court said:

"It is quite inconsistent with that fairness of trial to which every man is entitled that the jury should be prejudiced against him by any evidence except what relates to the issue; above all should it not be permitted to blacken his character, to show that he is worthless."

See, also, State v. Rainsbarger, 31 N. W. 865; People v. Ah Len, 92 Cal. 282, 284, 28 Pac. 286, 27 Am. St. Rep. 103; Same v. Devine, 95 Cal. 227, 232, 30 Pac. 378; Same v. Wells, 100 Cal. 459, 463, 465, 34 Pac. 1078.

Having reached the conclusion that the defendant did not have a fair and impartial trial, and for that reason that the judgment must be reversed, it is unnecessary to discuss the other assignments of error, which are not liable to again arise upon another trial. It is, however, proper to state that we are of opinion that there was no substantial variance between the description of the property in the indictment and the proofs submitted at the trial.

The judgment of district court is reversed, and the cause remanded.