# CHARLESTON.

BUTCHER, *et al. v.* SOMMERVILLE, *et al.*

Decided March 22, 1910.

1. EVIDENCE—*Declarations—Pedigree.*

    In an action involving title to land by inheritance, letters of deceased persons showing family conduct, and containing tacit recognitions and declarations of relationship are admissible as such on the question of pedigree.

2. APPEAL AND ERROR—*Harmless Error—Erroneous Instruction.*

    Although an instruction to the jury requested by plaintiff states a correct proposition of law, applicable to the evidence, its rejection will not be good ground for reversal, where the court has on motion of defendant, and upon the whole of the evidence rightfully instructed the jury that the evidence does not warrant a verdict for plaintiff and to find for the defendant. In such case the question of law propounded by plaintiff's instruction rejected becomes involved in and fairly presented by the instruction given to find for the defendant.

3. TRIAL—*Direction of Verdict.*

    Where the evidence given at the trial, with all inferences the jury could justifiably draw from it, is insufficient to support the verdict for the plaintiff. so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for defendant.

Error to Circuit Court, Harrison County.

Action by J. R. Butcher and others against S. H. Sommerville and others. There was a directed verdict for defendants, and plaintiffs bring error.

*Affirmed.*

*C. C. Lawson* and *Davis & Davis,* for plaintiffs in error.

*Dent & Dent* and *F. E. Parrack,* for defendants in error.

Miller, Judge:

This is a suit in ejectment. On the trial below the court refused two instructions proposed by plaintiffs, and, on motion of defendants, instructed the jury that the evidence did not warrant a verdict for plaintiffs and to find for defendants.

Plaintiffs and defendants both claim the land in controversy, as heirs of Adolphus Armstrong, deceased. It is admitted that Armstrong was of illegitimate parentage, his putative father being a man by the name of Maxwell Armstrong, his mother a woman by the name of Butcher. The plaintiffs say he was the son Polly Butcher, eldest daughter of Jasper A. Butcher, deceased; the defendants, that he was the son of Sally Butcher, a daughter of George Butcher, George and Jasper being brothers. If born of Polly the plaintiffs would inherit, if of Sally the defendants are entitled to the land.

The plaintiffs' evidence on the question of pedigree consists wholly of the evidence of oral declarations of deceased persons, and of facts and incidents in the history of the family of Jasper A. Butcher, showing or tending to show that Polly was the mother of Adolphus. The evidence of the defendants on the other hand includes not only much of the same class of evidence, but also the court records of the appointment and elections and qualifications of Adolphus Armstrong as deputy clerk and clerk of the circuit courts of Harrison and Taylor counties, during the years 1843, 1844, 1846, 1848, 1852 and 1858, and also much other documentary evidence, consisting of the family Bible of George Butcher, a letter from Sally Butcher to Maxwell Armstrong written just before the birth of Adolphus, as recorded in the Bible, and numerous letters some written by Armstrong himself to Mrs. J. W. Smith, some by her to him, and two of them written by J. W. Smith in 1886, all of a very convincing character, and showing and tending to show that Armstrong was the son of Sally.

These letters on the trial below were admitted in evidence over the objections of plaintiffs, and objections saved on the record. These objections present preliminary questions to be disposed of before reaching the main question raised by the peremptory instruction to the jury.

It is conceded that J. W. Smith was the legitimate son of

Sally Smith (nee Butcher) and Alexander Smith, deceased, and that the witness, Mrs. Smith, was his wife and widow, and defendants' claim is that Smith was the half brother of Adolphus, and that both were sons of Sally. The handwritings in the letters referred to were fully proven. The letters from Smith and wife to Adolphus were found among the latter's papers after his death, and his letters to her were produced and identified by Mrs. Smith on the witness stand. The objection to them, applying mainly to the letters of Mrs. Smith, is that her letters to Arm-. strong contain the declarations of a living witness, present and actually examined, on the question of pedigree, and for this reason are not admissible. The authorities cited by counsel, as well as our own case of *Peterson* v. *Ankrom,* 25 W. Va. 56, 61, do hold that where the evidence offered is the declaration of an individual, the declarant must be unavailable by death or otherwise. 2 Wigmore on Ev., section 1481; 2 Jones on Ev., section 322; 1 Greenleaf on Ev. (16 Ed.) section 144 b, c, d, e, and f; 2 Taylor on Ev., section 641.

But it is conceded that this is not the exact question presented here. The letters were admitted, not as the declarations of the living witness, but as those of Adolphus Armstrong and J. W. Smith, both deceased, being half brothers if both sons of Sally. The letters of Armstrong to which the two letters of Smith to him were evidently replies, were proven by Mrs. Smith to have been lost or destroyed. Both letters of Smith to Armstrong are dated at Kansas City, Mo., the first Nov. 26, the second December 4, 1886. The letters from Armstrong to Mrs. Smith are dated March 15, March 16, and March 24, 1904, June 15, 1903, and June 6, and June 19, 1905. Those from Mrs. Smith to Armstrong are dated March 21, and April 3, 1904, May 29, and June 12, 1905.

The first letter of Smith to Armstrong, November 26, 1886, apparently, is in reply to a letter from Armstrong to Sally Butcher, of November 15, 1886, for the writer says: "Mother sends me your letter of the 15th." He also encloses to Armstrong a letter from Dr. G. W. Mason, not in evidence, giving some information about the family at Stafford, Ohio, where they lived, and saying: "This matter I have to-day made arrangements to fix up. And also written to know what they need. I have heretofore refused to help father, as I have

frequently of late understood that both father and *Louwesa* were unkind to mother. Have written them in regard to it. This is what Mason refers to as being correct. Now if this be true it must stop. Our mother is old and feeble and must be treated kindly." Then referring to a claim of Dr. Mason on the property of the family at Stafford which needed attention, the letter continues: "Mother should not be forgotten in her old age, and so far as I know there is no body to remember her but you and I, at least in a way that could benefit her. They must all be old and feeble even *Louwesa,* and so far as I am concerned I am willing to do all in my power, even sacrifice my last cent, if necessary, and with your assistance think they might be made comfortable, as I presume you are much more able to do than I am." Reference is also made to visiting each other and to becoming better acquainted. In the next letter Smith among other things says to Armstrong: "Yours of the 1st received and fully noted. As to selling the property in Ohio and buying them a home here, think it would be a good idea, but perhaps neither of us realize their exact situation. Mother I understand is almost helpless. *Louwesa* has been almost an invalid for years, and father must be getting feeble. Six years ago when I was at home last, I thought none of them could possibly live another year. * * * If on investigation it is found best to move them I am willing to do so, and will only be too glad to have your assistance. * * * It would do mother's very soul good to hear from you. * * No difference what may have been she is our mother, and should not be forgotten. Circumstances possibly have been bad for which she was not to blame, and possibly but few women would have endured what she has. Under average circumstances she might have been a mother of whom you would feel proud, and know more of; but we will let the past go and be forgotten, and do what is best. Enclosed find letter from them which will give you a better idea of their situation, &c." The letters from Mrs. Smith to Armstrong address him, "Dear brother and friend." They give Armstrong information as to the physical and financial condition of "your sister," and of her needs, the difficulties encountered in taking care of her, and bills incurred therein, with request for money. Armstrong's letters to her are evidences of his responses to her calls for

help.    He sends her various sums of money to pay doctor bills, for provisions, &c.    These letters contain various pertinent expressions.    In one he says:    "I hear Louise is not provided for & that there is doctors bill unpaid & that the neighbors have been helping.    I want you to see to all this, you promised me. As soon as I hear from you I will answer with money.    I want doctor bill and all paid."    In another:    "She is old crippled & infirm and nothing remains for her but to be made as comfortable as may be by others the remainder of her life.    They tell me they have furnished coal & have some one to see to her.    Now you promised me to see to her & I still have confidence you will.    Write me at once—I don't want to go outside of you to see to their business."

We think the letters of Smith to Armstrong were clearly admissible.    They contain written declarations of pedigree of the same character as does most of the oral evidence of the witnesses for plaintiffs, and admissible for the same reason.    But it is said the letters of Mrs. Smith to Armstrong and his to her are not of the same character; that his letters to her, as the fact is, nowhere distinctly admits that Sally is his mother, or Louisa his sister; that he was not called upon in his replies to her letters to deny the relationship imputed in her letters to him, and that his letters to her are not admissible as evidence of admission by him of his parentage, and of his relationship to Louisa and Mrs. Smith.    We cannot concur in this view of the evidence.    Notwithstanding Armstrong makes no distinct admission, his letters are recognitions of his duty and responsibility.    They are communications as if between persons sustaining the relationship affirmed by the one, and not denied by the other.    Greenleaf on Ev., Vol. 1, (16th Ed.) at page 200, says:    "The correspondence of deceased members of the family, recitals in family deeds, such as marriage settlements, descriptions in wills, and other solemn acts, are original evidence in all cases, where the oral declarations of the parties are admissible."    And on page 201, he says:    "Under this head may be mentioned family conduct, such as the tacit recognition of relationship, and the disposition and devolution of property, as admissible evidence from which the opinion and belief of the family may be inferred, resting ultimately on the same basis as evidence of family tradition.    *   *   *   So, the declarations

of a person, since deceased, that he was going to visit his relatives at such a place, have been held admissible to show that the family had relatives there."

The letter proven to have been written by Sally Butcher to Maxwell Armstrong, dated May 23, 1823, recites her helpless condition, and appeals to him to come to her relief. According to the family Bible of George Butcher, father of Sally, "Adolphaus L. Armstrong" was born June 21, 1823, just twenty-nine days after the date of this letter. It is objected to this letter that it is not a declaration of relationship and therefore inadmissible as such. It was produced and proven to have been found among the papers of Maxwell Armstrong. It implies that he is responsible for the writer's condition, and taken in connection with the Bible, we think it was clearly admissible on the question of pedigree.

The next error assigned relates to the rejection of plaintiffs' instructions numbered one and two. Number one was intended to apply to the records of the appointment, election and qualification of Adolphus, as clerk and deputy clerk of the courts, introduced by defendants in support of their theory that at that time he had reached his majority. It propounded the proposition that under the law of Virginia, as it was from the year 1843 to 1848, inclusive, the constitution of 1830 not prescribing any qualification of age, a person under the age of twenty one years might have been appointed deputy clerk or even elected clerk of the courts. This proposition finds strong support in the case of *Harkreader* v. *State,* a Texas case, reported in· 60 Am. St. R. 40. If the case was properly taken from the jury, by the peremptory instruction to find for the defendants, the legal effect of this evidence is necessarily involved in the latter instruction, and the plaintiffs were not prejudiced by rejection of their instruction number one, or of their number two, as the latter was simply the statement of the legal consequences of the facts, as plaintiffs sought to establish them.

The last assignment of error is that the court improperly instructed the jury to find for the defendants. This requires a consideration of the whole evidence, as well as a proper understanding of the present status of the law on the subject of directing verdicts.

In the recent cases of *Williamson* v. *Nigh,* 58 W. Va. at

page 632, following *Cobb* v. *Glenn Boom & Lumber Co.*, 57 W. Va. 49 (49 S. E. 1005) the law is stated thus: "On a motion to exclude all the plaintiff's evidence and direct a verdict for the defendant, the court should be guided by what its action would be if the case were submitted to the jury, and they should find a verdict in favor of the plaintiff upon such evidence. If it would be the duty of the court to set aside the verdict of the jury because without sufficient evidence, then the court should sustain the motion to exclude, and instruct the jury to find for the defendant. But if, on the other hand, the evidence is such that, under the law, the court should refuse to set aside the verdict, the motion to exclude the evidence should be overruled." In *Hoylman* v. *Railway Co.*, 65 W. Va. 264, a personal injury case, in which an instruction to find for the defendant was refused, the cases on this subject are reviewed and the same rule announced. The same rule in substantially the same terms, is laid down by the Supreme Court of the United States, in *Louisville &c. Co.* v. *Woodson*, 134 U. S. 614, cited and quoted in the *Hoylman Case.* The language of the court is: "When the evidence given at the trial, with all inferences the jury could justifiably draw from it, is insufficient to support the verdict for the plaintiff, so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for defendant."

It is true as said in *Newhouse* v. *Railroad Co.*, 62 W. Va. 562, that a motion to exclude plaintiff's evidence and direct a verdict for defendant is equivalent to a demurrer thereto. What is the rule on demurrer to evidence? There has been considerable conflict, even in our own decisions on this question. The rule of *Mapel* v. *John,* 42 W. Va. 38, and *Talbott* v. *Railroad Co., Id.* 560, practically disapproved in *Gunn* v. *R. R. Co., Id.* 676, and later in *Shaver* v. *Edgell,* 48 W. Va. 502, was substantially re-affirmed in *Teel* v. *Railroad Co.,* 49 W. Va. 88, 89. And in the more recent case of *Kelley* v. *Railroad Co.,* 58 W. Va. 216, citing among other cases *Barrett* v. *Coal Co.,* 55 W. Va. 395, and *Mannon* v. *Railroad Co.,* 56 W. Va. 554, followed and applied in *Robinson* v. *Sheets,* 63 W. Va. 394, the rule as promulgated by these last cases is that "upon demurrer to evidence by defendant, if the plaintiff's evidence is sufficient to sustain his case, oral evidence of the demurrant conflicting with

that of the demurree is ignored, and the demurrer overruled, unless the oral evidence of the demurrant be so clearly preponderant over that of the demurree that a verdict for the demurree would be set aside."

As lastly announced, therefore, there is practically no difference in legal effect between the rule on demurrer to the plaintiff's evidence and the rule on a motion to exclude his evidence and direct a verdict for defendant, and we need not concern ourselves further with the distinction attempted to be made based on *Newhouse* v. *Railroad Co., supra.*

It remains to apply the rule to the evidence. Briefly then what is the evidence? For the plaintiffs, as claimed by their counsel in the brief, John R. Butcher, Jasper N. Butcher and Amanda Butcher, the surviving brothers and sisters of Polly Butcher, testify substantially that Adolphus was the illegitimate son of their sister, Polly Butcher; that he was born at the home of their uncle, Henry Butcher, brother of Jasper A. Butcher, and was brought to their father's home when a mere child by Polly Butcher, their sister; that he was treated by themselves and the rest of their connections as a member of their own family; that he lived with the family until he was about fourteen years old, and at all times recognized his relationship; and that he was called to the bedside of Polly Butcher, just before her death, and attended her obsequies with the family, and defrayed the expenses of her funeral, and thereafter for some years continued his intercourse with the surviving members of her family. T. M. West and Marshall Ford testify with reference to time and circumstance that Jasper A. Butcher, the father of Polly, told them at different times that Adolphus was the son of his daughter Polly, and West further states that Jasper Butcher told him that Max Armstrong was Dolph's father. John R., Jasper N. and Amanda Butcher and John Burchamer all testify that Sally Butcher bore two children before her marriage to Goldsmith both of which were girls, Mary Ann, and Louisa. John Burchamer says he associated with him in his youth at the house of his grandfather, Jasper A. Butcher. Josephene Burchamer says she heard him spoken of in the Jasper Butcher family as Polly's son. To Daniel Simington, according to his evidence, Adolphus said that he buried his mother in Lewis county long ago. In 1874, fifteen years before Sally died, he said in the hearing of

M. H. Dent, according to the latter's evidence, that his mother was dead, that he had seen that she was decently buried. To Marion Newlon, according to his evidence, Armstrong stated that his mother's name was Polly Butcher, and that he buried her in Lewis county. To George Smith, according to his evidence, he said that his mother's name was Polly Butcher; that he had long since seen that she was as decently buried as anybody, and within two weeks of his death he is said to have declared that he had neither father, mother, brother or sister. John Heath, testifies that he made a like statement to him, and declared that such relatives as he had lived in Lewis county, and that he had two uncles, and an aunt living in Lewis county.

It is urged by counsel that all these statements made by the dead man are consistent only with the theory that he was in truth and in fact the son of Polly Butcher, daughter of Jasper A. Butcher, and cannot be reconciled with the theory that Sally Butcher, who died in the year 1889, and was buried in the State of Ohio, was his maternal ancestor.

Judge M. H. DENT, who was of counsel for defendants, and called as a witness for plaintiff, explains that at the time of the declaration of Armstrong in his presence in 1874, he was a clerk in his office; that Armstrong was very sensitive about his illegitimate birth; that he endeavored to keep it from the public, as far as possible; that many persons twitted him about his birth, and that on the particular occasion referred to, one Burdette, standing in the door of the clerk's office, said to him, "Dolph, they say you let your mother die and be buried at the expense of the county." To which Armstrong angrily replied: "That is none of your business." After Burdette had gone, Armstrong, standing at the window, seemingly much worried, turned around, and without addressing the witness, but the witness understood, intending to destroy the impression made on his mind by the remark of Burdette, said: "That is a lie, my mother is dead, and I saw she was decently buried." It is argued that Armstrong could not have then referred to Sally Butcher, as she was not then dead, but that he was referring to Polly Butcher, who was dead. A number of witness say that when Armstrong was a child, and in after years, he called the wife of George Butcher, in whose home he was brought up, "mother," and that she, being dead, Armstrong was evidently referring to

her, not only on the occasion referred to by Judge DENT, but at the time he is alleged to have made similar declarations to other witnesses for plaintiffs.

The foregoing is practically all the direct evidence for plaintiffs. The evidence is entirely oral, mainly of witnesses directly or indirectly interested, either as plaintiffs or otherwise, with no documentary evidence—family Bibles, letters or any other documents to support it, and we are impressed by its general character, and by the facts appearing in defendants' evidence that much of it has been inspired by the witness T. M. West, who has worked up the case, and has acquired, by assignment, an interest in the claim of plaintiffs. The age of Polly Butcher is fixed by no Bible entry, or other document. John R. and Jasper Butcher, brothers of Polly, say that she died in 1853 to 1855, and put her age at her death at 35 or 40 years, thereby fixing the date of her birth in 1815 to 1818, or 1820. Amanda Butcher, a sister, did not fix the year of Polly's birth. The testimony of witnesses for defendants corroborates plaintiffs' witnesses in fixing the year of her birth at from 1815 to 1818, demonstrating almost to an absolute certainty that she was not born earlier than 1815. This is a very important fact in favor of defendants, for if the fact is, as claimed by defendants, and their oral and documentary evidence overwhelmingly shows, that Adolphus Armstrong was born in 1823, Polly, if born in 1815, was not over 8 years of age, and could not possibly have been his mother.

Now what is the evidence for defendants? First, we have the date of the birth of Sally, fixed by the entry in the family Bible of her father George, and mother Mary, the latter born in 1780, as shown by the inscription on her tombstone as November 19, 1801. The date of her birth is not seriously questioned. If born in 1801, and Adolphus in 1823, she was 22 years of age at his birth. Next are the court records, showing the appointment, election and qualification of Adolphus as deputy clerk, and clerk of the courts, 1843 to 1848. Though the potency of this evidence is questioned by the argument that the law of Virginia did not inhibit minors from appointment or election to the office of clerk of the courts, yet we regard it as almost certain that at the time of his appointment as clerk in 1848, Armstrong had passed his majority. If born in 1823,

he was then about 25 years of age, and if Polly was born in 1815 to 1820 she could not have been his mother.

Next is the letter from Sally to Maxwell Armstrong, the acknowledged father of Adolphus, already referred to, which in connection with the Bible entry of the birth of Adolphus on June 21, 1823, is very forceful. It is said that as this Bible entry appears after the record of the birth of Temantra, born July 3, 1825, and, as is claimed, in a different handwriting, it bears evidence of having been fabricated, and that little weight should be given it as evidence. Another fact urged in support of this theory is that the name, Adolphus, is misspelled, and contains a middle initial letter "L," never retained by Armstrong. Still another fact urged is that the name Louisa, Armstrong's reputed sister, does not appear in this record. We cannot adopt the views of counsel as to this evidence. The record is plainly a very old one, made long before there could have been any reason for fabricating it. The presence of the middle letter "L" is of course unexplained. But the fact is it was dropped by Armstrong—never used by him; but there is the name, and there is no evidence of the existence of another Adolphus Armstrong, and the record could have been intended for no other person. The absence of the name of Louisa can not destroy the record that was made. The letter and the Bible entry are independent facts, bearing on the question of Armstrong's pedigree, and very forceful and potent facts.

Then we have the letters of Armstrong to Mrs. Smith, and of Smith, her husband, to Armstrong. The latter are very forceful. They were written many years before Armstrong's death, containing declarations of relationship to him and were found in his possession. The letters of Armstrong to Mrs. Smith are tacit admissions that Louisa was his sister. If it be true, as argued by counsel on the testimony of Katherine Armstrong, a legitimate daughter of Armstrong's father, that Adolphus also offered her financial aid, the fact that he responded to the calls for support of his "mother" and "sister," and contributed largely to the support of both Louisa and Sally, her mother, and manifested great interest and concern for their proper care and maintenance, as shown by these letters, are most significant facts, not standing on the unsupported oral declarations of interested witnesses.

Lastly we have, supported by all this documentary evidence, the testimony of Mrs. Smith, as to her visits to Armstrong to see him in the interests of his mother and sister, and he then gave her money for their support, and that at other times he sent her money for the same purpose, and also to redeem his mother's property. We have also the positive evidence of some of the defendants, ancient persons acquainted with the facts, that Adolphus was the son of Sally; also of a large number of disinterested witnesses, namely, Margaret Butcher, Marshall Simpson, Jacob Alkire, Noah Life, Pascal P. Brown, Emzy Fisher, Hudson Bailey, Mary Brown, very old people, who lived in the same neighborhood at the time, who swear positively that Adolphus was the son of Sally Butcher; that during his childhood he lived with the family at the home of George Butcher, Sally's father, and called George's wife "mammy," some called her "Polly," accounting to some extent perhaps for the confusion of her name by some witnesses with "Polly" the daughter of Jasper. Margaret Butcher, born in 1816, says that Polly, Jasper's daughter waited on her when she was married; that she was not the mother of Adolphus—was too young for that. Emzy Fisher, age 89, well acquainted with George, Polly his wife, Sally his daughter, and Polly, daughter of Jasper, says, that there is nothing in the claim that Polly was the mother of Adolphus, that she knew he was the son of Sally. It is quite impossible to detail more of the evidence.

While some of the plaintiffs' evidence is in direct conflict with much of the evidence of the defendants, yet it is all oral, and as we view it, that defendants' is so overwhelming and so preponderating in character that no court could allow a verdict for plaintiffs to stand, and our duty to affirm the judgment below seems altogether plain, and this will be our judgment.

*Affirmed.*