# CHARLESTON.

Louise Jarvis Currence, *ex'rix. v.* Isaac C.
Ralphsnyder *et al.*

(No. 6388)

Submitted November 12, 1929. Decided November 19, 1929.

*Harvey W. Harmer* and *James R. Moreland,* for appellee.
*R. A. Blessing* and *George M. Ralphsnyder,* for appellants.

HATCHER, JUDGE:

Adolphus Armstrong, aged eighty years, died intestate and unmarried in 1907, leaving considerable property. The settlement of his estate has been attended with much litigation. See *Butcher* v. *Kunst,* 65 W. Va. 384; *Butcher* v. *Sommerville,* 67 W. Va. 261; *Woofter* v. *Matz,* 71 W. Va. 63; *Lynch* v. *Armstrong,* 81 W. Va. 135, 90 W. Va. 98, 99 W. Va. 509, and *Fisher* v. *Lynch,* 107 W. Va. 384, 148 S. E. 484. This is another act in that drama. Claimants of the estate were legion. The most prominent one for a time was Louisa Ann Armstrong (or Butcher), who claimed to be a sister of Adolphus. She died before realizing on her claim and in order to expedite a settlement of the estate a compromise was made May 31, 1911, between a large number of claimants whereby it was agreed that Tena Smith of Ohio, the main devisee of Miss Armstrong, should have one-third of the estate and the other claimants, commonly referred to as the West Virginia claimants, should have the remaining two-thirds interest. On December 26, 1914, the West Virginia claimants agreed that George Woofter and those he represented should have approximately 63% and William M. Ralphsnyder, who had acquired some of the claims, approximately 37% of the two-thirds interest. In the meantime, Dolly Armstrong and Edward Armstrong had asserted that they were half sister and half brother of Adolphus, had claimed the entire estate as his only heirs, and had conveyed their interests therein to Isaac C. Ralphsnyder. A third and final compromise was effected on March 27, 1915, wherein it was agreed that W. B. Lynch, as executor under the will of Louisa Ann Armstrong, should receive 20% of the estate of Adolphus (this included the share of Tena Smith); George Woofter and those he represented together with certain other claimants represented by Edward A. Brannon, attorney, should be accorded 27 7/9% of the estate (subject to certain interests), and to W. M. Ralphsnyder should be yielded 52 2/9% thereof. But it was

specified that out of this percentage W. M. was "to pay off and discharge any and all claims made to the estate of Adolphus Armstrong, deceased, by I. C. Ralphsnyder" as the purchaser of the claims of Dolly C. and Edward Armstrong. This agreement was signed by both Ralphsnyders. A suit entitled Lynch, executor *et al.*, against Dolly C. Armstrong *et al.*, was then brought in the circuit court of Harrison county by all the parties to the last compromise for the purpose of excluding certain claimants who were not parties thereto, and to have the estate distributed according to the provisions thereof. A decree was entered which recited the compromise and determined the interests of the parties accordingly. Under that decree, W. M. Ralphsnyder has already received from the estate of Adolphus Armstrong payments aggregating more than $75,000.00.

The consideration of the deed from Dolly C. and Edward Armstrong to Isaac Ralphsnyder was $5.00 and the promises of Isaac in a separate written contract to pay to them one-half of whatever amount he should receive from the estate of Adolphus Armstrong by reason of their deed to him, and if it became necessary to prosecute suits to enforce their claims, to litigate same in his own name and at his own expense and to make no final compromise without their consent.

This suit was brought to secure a settlement from the Ralphsnyders under that contract. The court found that of the 52 2/9% of the Armstrong estate accorded William Ralphsnyder by the other claimants, 27 5/9% was included as the consideration for Isaac Ralphsnyder signing the third compromise agreement; that one-half of the 27 5/9% so decreed to William amounted to 62/235ths of the amount he had received from the estate and ordered that the plaintiff recover from William and Isaac 62/235ths of the amount William had so received. A recovery was also ordered against the two for $1,567.13 legal costs paid by Dolly Armstrong in litigation of the claim of herself and Edward which was conducted by Isaac after the contract with him.

On behalf of plaintiff the following facts appear. Isaac Ralphsnyder is a lawyer. After he secured the contract with

Dolly and Edward Armstrong, he instigated and conducted litigation of their claims in their names. The bill prepared under his direction alleged (among other things) that the father of Adolphus was Maxwell Armstrong, Jr.; that he was also the father of Dolly and Edward by a subsequent marriage and that Louisa Ann Armstrong was not the sister of Adolphus. The claims of Dolly and Edward thus advanced lead to the final compromise. Isaac secured the assent of the Ohio and most of the West Virginia claimants, except William Ralphsnyder, to a compromise with Dolly and Edward. He then produced his deed from Dolly and Edward and concluded the negotiations in his own behalf. The leading claimants (except William) were ''anxious to compromise'' with Isaac; and without any consideration whatever from William but solely to secure the assent of Isaac (as the assignee of Dolly and Edward) to a compromise, the Ohio and West Virginia claimants surrendered to William 27 5/9% of the estate accorded them by the previous compromise, with the understanding that he was to settle with Isaac. The arrangement was made in this form at the suggestion of William's attorney for the purpose, he said, of avoiding encumbering the contract with such fractions as would express the several interests of William and Isaac who could adjust the matter between themselves.

William testified that within a few months after the death of Adolphus Armstrong he had engaged Isaac to ascertain who were the heirs of Adolphus and to purchase the rights of claimants to the estate; that Isaac had made such purchases at a total expense of about $6,500.00; that there was a collateral oral understanding between him and Isaac at the time of signing the third compromise agreement that Isaac would guarantee him (William) 37½% out of the 52 2/9% he was to receive by the compromise; that he knew nothing of the contract between Isaac and Dolly and Edward at the time of signing the third compromise agreement; that after he commenced to receive payments from the estate Isaac had demanded of him the difference between the percentage guaranteed in their collateral agreement and the percentage he

had received under the compromise; but that he had refused to pay Isaac any of this money because his attorney had advised him that the claims of Dolly and Edward were wholly unfounded and could not be enforced; that he had never paid Isaac directly or indirectly any part of the money received from the estate because of Isaac's ownership of the Dolly and Edward Armstrong interests, but refused to say whether he had paid Isaac any part of the money so received for other reasons; that he and Isaac are both bachelors; that he is sixty-three years old and Isaac is somewhat older; that he has resided at the old home place all his life, and Isaac has resided there a large part of his life, and does so now; that his relations with Isaac have continued friendly all the time; that Isaac had usually accompanied him when looking after the business of, or attending conferences in connection with, the Armstrong estate; that he had required the administrator of the estate to pay him his part in cash until the administrator complained, after which he accepted checks which he cashed; and that he did not deposit any of the money received from the estate in banks but used it generally in his business, refusing to specify how he had disposed of the money.

Isaac did not testify.

The defendants assert that plaintiff has a complete remedy at law. As Dolly and Edward had no contractual relations whatsoever with William, we find no merit in that contention. The arrangement between Dolly and Edward and Isaac constituted him their trustee. The terms of the final compromise made William the trustee of Isaac. It is unquestioned that equity is a proper forum in which to demand settlement of a trusteeship. *Wilson* v. *Kennedy*, 63 W. Va. 1.

The defendants contend that the contract sued upon is champertous and void, citing *Roller* v. *Murray*, 107 Va. 527, and kindred decisions. That line of cases follows the common law, and is not persuasive on us, as this Court is committed to a more liberal view. See *Graham* v. *Graham*, 10 W. Va. 355, 384; *Davis* v. *Settle*, 43 W. Va. 17, 25. Modern statutes have been generally held to modify if not entirely abrogate the ancient law on champerty. Pomeroy Eq. Juris. (4th Ed.),

p. 1982, note 2 to sec. 936; annotation 4 A.. L. R., p. 174; 11 C. J., p. 235-6. "The ground of its origin," says 5 R. C. L., p. 271-2-3, "is found in the ancient principle of the common law that nothing in action, entry or re-entry can be granted over, for so, under color of title thereof, pretended titles might be granted to great men, whereby right might be trodden down and the weak oppressed. * * * In this country it has been said that the reason for the ancient doctrine of champerty and maintenance does not exist." In this country rights of action may be assigned. "The right to purchase a lawsuit is not now denied." *Davis* v. *Settle, supra.* In discussing the modern view of champerty the Supreme Court of Oregon said: "With few exceptions, not material here, whatever a man may own he may sell; and whatever a man may lawfully sell, another man may lawfully buy." *Brown* v. *Bigne,* 14 L. R. A. 745, 748. Whatever a man may lawfully buy he may have lawfully adjudicated to him. Consequently, it is well said that the legal principle upon which common law champerty is grounded no longer exists. Why then uphold the body of this law when the spirit has departed? *"Cessante ratione legis cessat ipsa lex."* *Cook* v. *Ins. Co.,* 105 W. Va. 375 (379). Therefore this Court will not nullify the contract merely because it savors of champerty under the common law, but only if Dolly and Edward Armstrong had secured such an advantage thereby as would be inequitable to enforce. The record discloses no such advantage to them.

The defendants allege error because certain special pleas tendered by them were rejected. As the matters contained in the pleas could have been set up in defendants' answers, it was not error to exclude the pleas. Hogg's Eq. Pro. (Carlin's Ed.), sec. 412.

Defendants plead laches. As they point to no specific instance of disadvantage to them by reason of delay, the doctrine of laches does not apply. *Camden* v. *C. & C. Co.,* 106 W. Va. 312, 316.

Defendants question whether the contract sued upon is properly proven. Several witnesses testify that the signature thereto is that of Isaac. In his plea of champerty he admits,

for the purposes of this suit, the contract as alleged. C. M. Bennet (whose evidence thereon was improperly excluded by the trial court after submission of the cause) testified that he was present when Isaac delivered the contract to Dolly and Edward, and that the contract is now in the same condition as it was then. Consequently the contract is sufficiently proven despite some interlineations and erasures apparent on its face.

Defendants charge that in the litigation brought in the name of Dolly and Edward (prior to the final compromise) it was alleged by them that they were the sole heirs of Adolphus and entitled to his estate, and that this allegation was equivalent to a repudiation of the deed and contract upon which the plaintiff relies in this suit. Defendants overlook the undisputed proof that the pleadings in the Dolly and Edward litigation were prepared under the direction of Isaac, who for reasons known only to himself saw fit to have the transaction between himself and Dolly and Edward ignored for the time being.

In the suit of *Lynch v. Armstrong, supra,* the decree adjudicated that Dolly and Edward had no title to the estate of Adolphus. That adjudication, defendants say, bars recovery in this cause. Defendants again overlook that the bill in *Lynch v. Armstrong* set up the deed from Dolly and Edward to Isaac and alleged that Dolly and Edward were made parties only to be heard on whether they executed the deed to Isaac. Defendants also overlook the paragraph in the decree immediately preceding the adjudication upon which they rely, wherein the court found that Dolly and Edward had disposed of their interest to Isaac. Consequently the adjudication was based solely on the deed to Isaac whereby Dolly and Edward had divested themselves of interest and was not a finding that they never had a valid claim to the estate of Adolphus.

William charges that Dolly and Edward conspired with Isaac to acquire the estate of Adolphus. No proof was offered in support of this charge, and the transaction between the three shows no guile on the part of Dolly and Edward.

William surrendered no jot of his claim by reason of the coalition between Dolly, Edward and Isaac, so his right to complain thereof is not apparent.

In oral argument counsel for defendants stated that their main contention is that Dolly and Edward had no valid interest in the estate of Adolphus, that Isaac acquired no valid claim by reason of their deed to him, and that William is therefore under no obligation to pay Isaac anything. If Isaac had to establish legally the Dolly and Edward interests before receiving any money under the final compromise, it was of no benefit to him. His labor of seven years to advance those interests was in vain. In fact, his position was worse than before. Without the compromise the establishment of his claim would have brought him one-half of the entire Adolphus estate. After the compromise the establishment of his claim would have brought him only one-half of 27 5/9% of the estate. Under the compromise he was the loser by 36 2/9% of the estate in case he would have vindicated his title. Such a construction of the compromise is untenable. Besides, who gave William any authority to deny the validity of the Dolly and Edward claims? Certainly not the other claimants who set aside of the interests theretofore conceded them, 27 5/9% for the satisfaction of the Dolly and Edward claims. If instead of awaiting the arbitrament of the courts, certain of the claimants saw fit to concede Dolly and Edward a controvertable interest, how did that in any way affect William? He furnished no part of the 27 5/9%; he conceded nothing; and it was certainly no affair of his how the other claimants disposed of their interests. In committing the 27 5/9% to William's hands, there was no intention on the part of the other claimants to give it or any part of it to him: or to have him hold it until Dolly and Edward's claim was legally established. They simply made him the recipient of that percentage at the request of his own attorney (to save fractions) for the purpose of passing it on to Isaac. Now, as between Isaac and William and the other claimants, it was of no consequence to the claimants that because of vexatious fractions, or for any other reason, this percentage was placed

in William's hands. But as between William and Isaac, William became the trustee of Isaac for the percentage so committed. Isaac was also a trustee—the trustee of Dolly and Edward for one-half of that percentage. Isaac could give ("guarantee") or yield to William any part or all of his one half of the 27 5/9%, but he could not give William any of the one-half of that percentage which was due to Dolly and Edward. William has as yet (according to him) never paid over any part of that percentage to Isaac. So William must account to the plaintiff for one-half of the 27 5/9%, and Isaac must also account for that one-half by reason of his dereliction as trustee in permitting William to receive and retain the portion due Dolly and Edward.

William finally complains because he is made jointly liable with Isaac for the $1,567.13 which Dolly paid out in litigation after the contract with Isaac and at his instigation. The circuit court evidently took the view that despite William's protestations, he and Isaac were hand-in-glove in this affair from its inception. And when we review this entire cause, and particularly when we contemplate the close and uninterrupted harmony between the two brothers during the entire period, the manipulation by which the concession to Isaac was placed in William's hands, the meek submission of Isaac to William's denial of Isaac's rights, and the refusal of William to disclose what he has done with the money received from the estate or to say whether he has turned over any of it to Isaac, we cannot say that the lower court is plainly wrong. Because of the express trusteeship of Isaac and William neither the statute of limitation nor laches bars this item under the circumstances of the cause. *Ruckman* v. *Cox,* 63 W. Va. 74; *Keller* v. *Washington,* 83 W. Va. 659; *Bennett* v. *Bennett,* 92 W. Va. 391, 399; *Carter* v. *Carter,* 107 W. Va. 394, 148 S. E. 378.

The decree will therefore be affirmed.

*Affirmed.*