# CHARLESTON.

STATE *v.* A. F. ROBISON

(No. 6764).

Submitted October 21, 1930. Decided October 28, 1930.

*S. A. Powell*, for plaintiff in error.

*Howard B. Lee*, Attorney General and *W. Elliott Nefflen*, Assistant Attorney General, for the State.

MAXWELL, JUDGE:

The indictment was in two counts. By the first count, attempt was made to charge the defendant with obtaining

$3,500.00 of G. A. Bowyer in Gilmer County by false pretenses. In the second count, it was attempted to charge the defendant with the larceny of said sum. The trial court sustained defendant's demurrer to the first count, but overruled the demurrer to the second. A trial of the issue upon a plea of not guilty, under the second count, resulted in a verdict of guilty and a penitentiary sentence of seven years.

The initial question goes to the sufficiency of the second count. It reads: "And the Grand Jurors aforesaid, do further present, that on the .... day of November, 1921, the said A. F. Robison, in the County aforesaid, and in the state aforesaid, thirty-five hundred dollars ($3,500.00), the property of G. A. Bowyer, feloniously did steal, take and carry away, against the peace and dignity of the State." This count is challenged on the ground that it does not sufficiently describe the property alleged to have been stolen.

The common law obtains in this state save as changed by the constitution or by legislation. Constitution of West Virginia, Article VIII, sec. 21; Code, chap. 13, sec. 5. The common law rule covering an indictment for the larceny of money required particularization of the kind of money alleged to have been stolen. We have no statute changing the rule as to larceny.

> "An indictment for stealing money is not sufficient, if it state only the aggregate amount, without any specification of the number, kind or denomination of the pieces; but the number of the pieces and their denomination, and whether of silver, gold or copper, should be stated, and regularly the value of each kind, if known. Hence a common law indictment for the larceny of money, which merely describes the subject of the larceny as a certain number of dollars in lawful money of the government, of a stated value, would be too indefinite and uncertain, and should, according to the great weight of authority, be quashed on motion. It is necessary to allege that the money stolen is lawful money or current coin of the United States or some other government." 17 R. C. L., 57.

To like effect: 36 Corpus Juris, 816; II Wharton's Crim.

Pro., (10th Ed.), sec. 844; Hochheimer's Crim. Law, sec. 155; *People* v. *Hunt*, (Ill.) 96 N. E. 220, 36 L. R. A. (N. S.) 933, and note. As evidence of this requirement, see standard forms: Mayo's Guide, p. 400; Kerr's Criminal Forms, p. 1162, et seq; Hochheimer's Crimes and Criminal Procedure, sec. 715; Bishop's Directions and Forms, secs. 602-3; Encyclopedia of Forms and Precedents, Vol. 11, p. 248, et seq.

In Bishop's New Crim. Pro., (2nd Ed.), Vol. 3, sec. 704, the author says: ''Simply to state the subject of the larceny as so many dollars, or so many dollars in money, without further particularization, is, by all, deemed ill.'' In *Merwin* v. *The People*, (Mich.) 12 Am. Rep. 314, the court held bad for uncertainty, a charge of larceny of ''one hundred and thirty-five dollars of the property, goods and chattels'' of C. In the very able opinion in that case, the judge, speaking for the court, says:

''I have found no case, and no principle of common-law pleading, upon which such an indictment or information can be sustained without showing, upon the face of the instrument, some excuse for the want of greater particularity. By the well-settled principles of common-law pleading, the defendant was entitled, in fairness, to either a statement of the kind, denomination and number of the pieces, notes or bills claimed to have been stolen, or to an allegation of some excuse for the omission.''

An indictment for the larceny of one hundred and thirty dollars was held insufficient in *Barton* v. *State*, 29 Ark. 68. In commenting upon the indictment, the court said: ''We can find in no text book of precedents for indictments, as loose and vague a description of money when the subject of larceny, as in the indictment before us.'' Our search has been equally unfruitful.

It is also pointed out that the second count does not contain an allegation of value. Ordinarily, of course, value must be averred, but where the charge is for the larceny of money, properly described, and further characterized as current money of the United States, the better rule is that an averment of value is superfluous. II Wharton's Crim. Pro., (10th Ed.),

sec. 854; Encyclopedia of Forms and Precedents, Vol. 11, p. 245. If the count in question were sufficient in particularizing the property stolen and in denominating it as current money of the United States there would be no necessity for an allegation of value. As it stands, an allegation of value would not help it.

On behalf of the state it is urged that the objections to the second count are purely technical and therefore should be ignored. What is meant by "technical"? Does it mean that which is useless, form rather than substance, or does it mean exactitude in matters which of necessity must be exact? Often, reasonable rules are attacked as technical when their purpose is merely to require accuracy. The term is much abused and frequently is made to carry a somewhat sinister meaning as though that which is technical in the law is something taboo,—to be interdicted in the administration of justice. In truth, the very guarantees of our liberties lie in the exactness of the law,—technicalities; among which, is the guarantee that one may not be put on trial for his life or liberty save upon indictment of a grand jury definitely charging him with a specific offense. Also, he is entitled to trial before an impartial and fully qualified jury of his peers, and to be confronted by the witnesses against him; and only once can he be put in jeopardy for the same offense. Technicalities? Yes, all of them. Exactitudes. And many more are like unto them. Some are substantive, others procedural. The charge of technicality seems to be a convenient cloak to which resort is not infrequently made in attempted justification for getting things wrong. By this means, it is sought to avoid the requirements of precision. Looseness of pleading, civil or criminal, almost inevitably leads to disaster. In the drafting of indictments, wherein from time immemorial it has been considered that there must be a high degree of completeness and precision, it is at least a safe and commendable course to adhere to the generally recognized requirements which, in the main, represent the wisdom and the experience of many generations of competent predecessors.

In the instant case, the charge is for the larceny of "dol-

lars.'' Was it coin or paper currency? And, what kind of dollars? Mexican? Canadian? or of the United States of America? Does the presumption exist that the latter was meant? Charges of crime cannot be predicated upon presumption; they must be based upon accurate and definite allegation. While a situation such as that which is presented in this case, necessitating a reversal on a procedural matter, is unfortunate, it is much better thus than for the court to attempt to tear down or ignore time honored rules of accuracy in the preparation of indictments in order to let a lame case through.

This is not a defect that is cured by Code, chapter 158, sec. 11, being our criminal statute of jeofails. That statute was not meant to introduce ''a carelessness or laxity in pleading, but merely to cure those defects which the over-nicety of the courts had introduced into the common law.'' *Old* v. *Commonwealth,* (Va.) 18 Gratt. 915. The statute does not reach a matter of substance in description of property alleged to have been stolen.

We reverse the judgment, set aside the verdict, sustain the demurrer to the second count and discharge the defendant.

*Reversed; defendant discharged.*

HATCHER, JUDGE, dissenting:

The learned opinion of the majority of the court is fully in accord with the ancient common law practice. It is true that the opinion cites some modern authorities; but the latter speak not from their own wisdom or experience, as the court would indicate. On the contrary, they close their eyes to modern conditions and grope back until they fasten on some such case as *State* v. *Longbottoms,* 11 Humphreys (Tenn.) 39, which, in turn blindly attaches to older English decisions. Mr. Justice Holmes disposes of any claim this character of decisions may have to representing the wisdom of past generations, as follows: ''It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from

blind imitation of the past." Holmes, The Path of the Law, 10 Harv. L. R. 457, 468-9. (With deference to the erudite Justice, I would substitute the word "unsatisfactory" for the word "revolting.") Those early English decisions were doubtless justified by conditions then prevailing. England's soldiers returning from wars on the continent, and her ships returning from trade and conquest may have flooded the country with foreign coins. There may have been ignorance or uncertainty among the people as to the identity and value of such coins. But whatever the reason then for requiring minute specification of money in indictments, that reason does not exist now in reference to our money. Descriptive phrases can add nothing at present to the popular conception of the word "dollars." But the majority opinion ignores the completeness of that conception and reverts to Elizabethan refinements and niceties, asking "Was it coin or paper currency? And what kind of dollars? Mexican? Canadian? Or of the United States of America?" These questions would not be asked if the majority would but lift its vision to the present. A Mexican dollar is as much an object of curiosity in this section now as a coin of George III. Never having yielded to the lure of Canada, and of things Canadian, the knowledge of this Court that Canada even mints a dollar was gleaned solely from a book on numismatics. And as to silver dollars of the United States—"Oh where are the snows of yesteryear?" (A friend mentioned to me, as a matter of interest, having seen a United States silver dollar recently in Italy.)

The word "dollar" is in daily use by every adult in the United States. Every article purchased or sold is valued by the dollar (or its fractions). The usual pay for service in any capacity is in dollars. Every check drawn is an order for, and every note given is a promise to pay, dollars. The statute on larceny itself measures the punishment by the value of the stolen property in dollars. The courts take bonds, assess fines and render judgments, all payable in dollars. And everywhere in this country, on the street, in the home, the school, the church, the store, the factory, the bank, the legislative hall, and the courtroom, whenever the word "dollar" is mentioned

it always means one and the same thing—the monetary unit of the lawful currency of the United States. "A dollar is the unit of our currency. It always means money or what is regarded as money." *U. S.* v. *Van Anken,* 96 U. S. 366, 368. "Everybody in this country knows that the word dollar means a certain amount of money," said Anders, J., in *State* v. *Ryan,* 34 Wash. 597, 604. "There is no ambiguity about the word 'dollars.' If any word has a settled meaning at law and in the courts it is this. It can only mean the legal currency of the United States." *Halstead* v. *Meeker,* 18 N. J. Eq. 136, 139.

If there is now no uncertainty about the meaning of the word "dollars," why require amplification merely because there was uncertainty about money at a former time? If at present the word "dollars" always means lawful money of the United States and is so understood by everyone, then the presumption to that effect suggested in the majority opinion is entirely gratuitous. An indictment for a theft of dollars is just as significant under that definition as if the word "dollars" were followed by the words "lawful money of the United States." "Dollars" (as thus defined) implies *value,* and an allegation of value in connection with the word, would be downright surplusage. While the common law requires exactness in pleading, it does not require redundancy. An indictment is required to go no further than to notify the accused with certainty of the nature of the offense charged. 10 Ency. Pl. & Pr. 473. "No greater particularity is required (in an indictment) than to express the same fact in every day parlance." 12 Stand. Ency. Pro. 304, note a. I am not to be understood as favoring the relaxation of the rule requiring certainty in pleadings. I merely oppose too "great strictness" in indictments which has been declared to be "a blemish and inconvenience in the law" by one of its greatest proponents. See 2 Hales Pleas of the Crown 193. As the word "dollars" is so well defined now, it seems to me that a charge of a theft of dollars is sufficiently specific to meet all reasonable requirements of the common law. Courts should administer laws, in the language of a great lawyer, "with a view to the conditions of this generation, and not to those of generations dead and

buried centuries ago.'' Lyman Trumbull before the Ill. St. Bar Ass'n., Jan. 24, 1893.

Now, if it be material for the accused to know the denominations or the character of the dollars alleged to have been stolen, that information can be furnished, on request, by a bill of particulars. In *Dempster* v. *Purnell*, 3 M. & Gr. 375, 388, 133 Reprint Eng. R. 1189, 1194, decided in 1841, Maule, J., declared: ''In proceedings according to the course of the common law, such a thing as a bill of particulars is not known.'' This declaration is accepted and followed in 3 Ency. Pl. & Pr. 518, and 4 Stand. Ency. of Pro. 377. It is not entirely accurate however. A bill of particulars was known even to the ancient common law, but its recognition was so rare as to render its use negligible. See the rare instances of its use, cited in the leading cases of *Comm.* v. *Snelling*, 15 Pick. (Mass.) 321, 328, etc.; *Tilton* v. *Beecher*, 59 N. Y. 176, 184, *etc.; Mathis* v. *State*, 34 So: (Fla.) 287, 289, etc. The use of bills of particulars became general only within the last century. As late as 1917, Burks, J., said there was no case in Virginia involving the right of an accused to demand a bill of particulars though admitting the practice was common in a great majority of the states. See *Pine* v. *Comm.*, 121 Va. 812, 93 S. E. 652, 659. The first reported application of a bill of particulars to a criminal case in this jurisdiction was in 1910. See *State* v. *Rr. Co.*, 68 W. Va. 193. This case was followed by *State* v. *Lewis*, 69 W. Va. 472, definitely making the bill a part of our criminal procedure. The bill is not a part of the indictment, and is not treated as a pleading. It cannot take the place of essential averment. However, if the indictment charges an offense, the bill may be used to ''amplify'' the charge. Anno. 10 A. L. R., 982-3; 4 Stand. Ency. Pro. 378. ''A bill of particulars is for the purpose of furnishing details omitted from the accusation or indictment, to which the defendant is entitled before trial,'' said LIVELY, JUDGE, in *State* v. *Counts*, 90 W. Va. 338, 342. Its object, said Burks, Judge, in *Pine* v. *Comm.*, *supra*, is ''to supply the fault of generality,'' and ''to state with greater particularity than is done in the indictment the cause and nature of the accusation.''

As a bill of particulars was not used in the practice of the ancient common law, the detailed information required was necessarily expressed in the indictment. But that necessity has been eliminated through our modern use of the bill. It is no longer necessary or desirable to cumber an indictment with details which may be of no importance to an accused, but which can be supplied later if requested.

The chief advantage of the common law over other systems of laws has been its adaptability to new or changed conditions. See generally 12 C. J. 178-9. It has certain fixed principles; but from those principles it evolves new rules as new conditions require. It also changes or discards old rules when no longer applicable. Hence, the maxim, *cessante ratione legis cassat ipsa lex,* (with the reason of law ceasing, the law itself ceases). The 'adaptability of the common law to changed circumstances has been termed "its peculiar beauty" and "its peculiar merit." *Stokes* v. *Co.,* 3 Leigh 318, 338; *Harris* v. *Comm.,* 113 Va. 746. To preserve that merit, the courts were admonished to liberalize the common law "to the circumstances of the country so as to effect a reasonable and substantial, rather than a literal compliance with its principles." See 1 Tucker Com., 9. That admonition has been heeded in many decisions. See the brilliant article by Dr. T. Porter Hardman, "Stare Decisis and the Modern Trend," published in the W. Va. Law Quarterly, April, 1926. As early as 1806, Judge Roane (whom Thos. Jefferson desired to succeed John Marshall) observed that as time increased our severance from England, there would be "a correspondent variation in the rules of the common law." *Baring* v. *Reeder,* 1 H. & M. 154, 162. As late as November of 1929, this Court also noted that variation. See *Currence* v. *Ralphsnyder,* 108 W. Va. 194. If this adaptability be disregarded by the courts, the common law will be deprived of that merit which has led to its expansion. It will then become immobile in the rigidity of its own precedents.

It was ordained by the Thurians that whosoever proposed either to abolish old laws or to establish new, should present himself to the people with a halter about his neck; to the end

that if his proposition should not be approved, he might immediately be hanged. It followed that the Thurians were not noted either for their progress or their lawgivers. A collar of precedents may stifle legal expansion as effectually as the Thurian halter. Veneration of precedent, alone, has little utility. That veneration becomes vital when it uses precedent to illuminate the present. Uniformity in decisions is imperative where the circumstances are similar. But that uniformity does not require making a fetish of precedent. Reason, not precedent, is the inspiration of the common law. Courts should be conservative. But that quality need not block progression. Courts must not lag when civilization marches.