**NEUFIELD et al. v. UNITED STATES.**
No. 7558.

United States Court of Appeals for the
District of Columbia.

Decided Jan. 27, 1941.

MILLER, Associate Justice, dissenting in part.

Levi H. David, Richard Tedrow, and Robert I. Miller, all of Washington, D. C., for appellants.

Edward M. Curran, U. S. Atty., and William S. Tarver, Asst. U. S. Atty., both of Washington, D. C., for appellee.

Before STEPHENS, MILLER, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

The appellants Neufield, Foley, Flynn and Rubin, hereafter referred to as defendants, or by name, were, on November 17, 1939, convicted upon a jury trial in the District Court of the United States for the District of Columbia of the crime of robbery. Rubin, on November 18, moved separately, and Neufield, Foley and Flynn, on November 20, moved jointly and severally, for a new trial on various grounds which need not here be stated. The motions were denied, and on December 15, 1939, each of the defendants was sentenced to imprisonment in the penitentiary for from three to fifteen years. The statute under which they were indicted provided that "Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery . . .." Act of March 3, 1901, 31 Stat. 1322, c. 854, § 810, D.C.Code (1929) tit. 6, § 34. The indictment charged that the defendants on June 10, 1932, in the District of Columbia "by force and violence, and against resistance, and by putting in fear, and by sudden and stealthy seizure and snatching, feloniously did steal, take and carry away, from and off the person, and from the immediate, actual possession of one Thomas E. Elgin, then and there being, a certain sum of money, to wit, nine thousand and twenty-one dollars in money, of the value of nine thousand and twenty-one dollars, of the money and property of the Washington Mechanics Savings Bank, a body corporate; . . .."

Briefly stated, the evidence showed that: On June 10, 1932, the Washington Mechanics Savings Bank operated a branch on Georgia Avenue in the District. When the bank opened for business on that day, money had been distributed from the vault to the cash drawers of four tellers, including Elgin, mentioned in the indictment. At about eleven o'clock five men came into the bank. One stood in the doorway, apparently as a lookout; two drew guns and ordered the employees—there were no customers in

the bank at the moment—to hold up their hands; two leaped over the counter and herded all of the employees—seven, including the bookkeepers—into a rear room and compelled them to lie face downward on the floor; one of the robbers then held a bag into which the others loaded the money from the tellers' drawers; the five men then left the bank in single file and drove away in an automobile which had been parked at the curb around the corner. After the robbers had left, a customer, one Jacob Gritz, seeing them leave, entered the bank, saw no one there, but on walking into the rear room found the employees on the floor as above described. A checkup disclosed $9,030.36 missing, of which $3,024.23 had been taken from the drawer of Elgin. Flynn was identified by Elgin and by Gritz; Foley was identified by a bank teller, Richard S. Sanderson; Neufield was identified by Wallace F. Randolph and Sarah E. Randolph, his wife, who drove to the bank on the morning in question, arriving while the robbery was in progress. They saw the robbery occur, Randolph from near the door of the bank, Mrs. Randolph from the car through the bank window. Mrs. Randolph identified Rubin also. Both of them saw the stuffing of the money into the bag as above described, and both saw the five men leave the bank.

The defendants were indicted on February 1, 1933. Foley was arraigned June 19, and Neufield, Flynn and Rubin, September 21, 1939; each pleaded not guilty. The case was called for trial November 15, 1939. The lapse of time between the indictment and the arraignment and trial of the defendants was due, according to the record, to the fact that Neufield and Flynn were in the meantime serving time in New York for another offense. Where Foley and Rubin were and why they were not sooner arraigned and tried does not appear. According to statements made at the commencement of the trial in the instant case by counsel for Neufield, one Spencer Waldron, apparently the fifth man involved in the events at the bank on June 10, 1932, had, at a date not stated but apparently not long after June 10, pleaded guilty to a charge describing the same offense as is the subject of this case, and had been sentenced to imprisonment, and had for several years prior to the arraignment and trial of the present defendants been confined in Alcatraz.

When the instant case was called for trial Neufield and Flynn each moved for a continuance. Neufield moved for compulsory process against Spencer Waldron. Each defendant moved at the close of all of the evidence for a directed verdict of not guilty. Each requested a view by the jury. Each moved for an arrest of the judgment. All of these motions were denied and out of these rulings by the trial court arise the questions presented on this appeal. We shall discuss each topic separately, stating thereunder such further facts as are necessary to an understanding of the points raised.[1]

## I

The motions for a continuance. *By Neufield.* When the case was called for trial a statement, the substance of which follows, was made in behalf of Neufield by his counsel Solomon: Pursuant to an arrangement whereby the District Attorney was to notify Solomon at least ten days prior to the trial of the date fixed for its commencement, William S. Tarver, the Assistant United States Attorney in charge of the case, telegraphed Solomon at his office in New York on November 6, 1939, that the case would be assigned for trial on November 15. Solomon was out of the city and in consequence did not receive the telegram until November 8. Solomon and Neufield (who was apparently at large on bail) then attempted unsuccessfully to locate the latter's witnesses. Between the date of the filing of the indictment, February 1, 1933, and the time of fixing of bail for Neufield, September 21, 1939, he had been confined in Sing Sing Prison. This increased the difficulty of locating witnesses. Process servers were out and also a private detective to help locate them. In the event of a continuance, in the opinion of Solomon, he would be able properly to prepare the case and locate the witnesses. Neufield had waived extradition. It appears from the record that Solomon had represented Neufield since his arraignment, September 21, 1939. The gist of the motion for continuance was an

---

[1] At the trial Neufield was represented by Abraham Solomon of the New York Bar, Foley by R. L. Tedrow, Flynn by Levi H. David, and Rubin by Robert I. Miller, all of the District of Columbia Bar. On the appeal the representations are the same except that both Neufield and Flynn are represented by David, Solomon not appearing.

alleged need of further opportunity to prepare the defense of the case and to locate witnesses and to procure their attendance through compulsory process; the guarantee of the Sixth Amendment that an accused in a criminal prosecution "shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . .," was urged.

The granting or refusal of a continuance is a matter of discretion of the judge to whom application is made. Avery v. Alabama, 1940, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377; Isaacs v. United States, 1895, 159 U.S. 487, 16 S.Ct. 51, 40 L.Ed. 229; Tomlinson v. United States, 1937, 68 App.D.C. 106, 93 F.2d 652, 114 A.L.R. 1315, certiorari denied, 1938, 303 U.S. 646, 58 S.Ct. 645, 82 L.Ed. 1107. Therefore, under elementary principles of review, a trial court's ruling granting or refusing a continuance will not be reversed except for abuse of discretion. A party seeking a continuance must make a showing that the same is reasonably necessary for a just determination of the cause. If the continuance is sought for the purpose of securing the attendance of witnesses, it must be shown who they are, what their testimony will be, that it will be relevant under the issues in the case and competent, that the witnesses can probably be obtained if the continuance is granted, and that due diligence has been used to obtain their attendance for the trial as set. These propositions are so elementary as to require the citation of nothing but general authorities. See 12 American Jurisprudence, pages 448–471, inclusive, especially Sections 5, 9, 23, 24, 28; 16 Corpus Juris, pages 450–512, inclusive, especially Sections 829, 831, 846, 892, 921, 925; 22 C.J.S.Criminal Law pp. 737–837, inclusive, especially §§ 486, 488, 491, 502, 513.

In the instant case no showing was made that during the time between the arraignment on September 21, 1939, and the date of the trial, November 15, 1939, Neufield's counsel Solomon was excusably prevented from searching for witnesses or otherwise preparing the defense of the case. No showing was made. as to the identity of the proposed witnesses or as to the nature, relevancy and competency of their testimony, or that they could be obtained if the continuance was granted. In these circumstances and in view of the further fact that the ten days' notice requested by Neufield's counsel of the date of trial was given, we cannot say that the trial judge must reasonably have concluded that the showing for a continuance was sufficient, and we cannot, therefore, say that he abused his discretion in refusing the continuance. Indeed, we think the showing for continuance was clearly insufficient. If, under the circumstances set out, a continuance must be granted, there will be no end to delays in criminal cases. Moreover, it was not made to appear in Neufield's motion for a new trial that any harm came to him through the refusal of the continuance. While the motion in general terms charged error in not granting the continuance, it made no particularization of any material witnesses or testimony that could have been produced had the continuance been granted. And it particularized no way in which Solomon could better have prepared the case if the continuance had been granted. In Avery v. Alabama, supra, the Supreme Court said: "That the examination and preparation of the case, in the time permitted by the trial judge, had been adequate for counsel to exhaust its every angle is illuminated by the absence of any indication, on the motion and hearing for new trial, that they could have done more had additional time been granted."[2] And in the same case the Supreme Court recognized that "Since the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial, the fact, standing alone, that a continuance has been denied, does not .constitute a denial of the constitutional right to assistance of counsel."[3]

*By Flynn.* In respect of this motion the bill of exceptions shows the following:

"The Court. What about the others?

"By Mr. David. If your Honor please, I have not entered my appearance for the defendant Flynn for the reason that I have not yet been employed. The defendant Flynn sent for me, and I went to the jail; and he engaged me for the limited purpose of endeavoring to get the bond reduced. At the time he spoke to me, which was on the 8th of November—a week ago, last Wednesday——

"By Mr. Tarver. He spoke to me Wednesday.

---

[2] 308 U.S. at page 452, 60 S.Ct. 321, 84 L.Ed. 377.

[3] 308 U.S. at page 446, 60 S.Ct. 321, 84 L.Ed. 377.

"By Mr. David. But I could not see you until Thursday.

"By Mr. Tarver. But you spoke to me Wednesday.

"By Mr. David. Well, I came from the jail and went directly to the office of the District Attorney; but Mr. Tarver was officially engaged, and I could not speak to him only for a minute or two. The next day we had a conference. The conference was limited exclusively to the question of reduction of bond. We talked some time about that.

"I spoke to your Honor with a view of finding out whether it was necessary for us to come before you in open court to discuss the situation; but your Honor indicated to me that your Honor did not think you would be willing to reduce bond at this time, which I reported to defendant Flynn. His purpose was that if he could get that bond reduced, he would be able to get out and to engage counsel and to prepare his defense. This case is a very complicated case, as I understand. I do not know very much about the merits.

"The Court. Is there anything complicated about a robbery? It is a question of whether he did or did not rob someone.

"Mr. David. I understand; but there are a lot of complications here, and the Government has been at this seven years and more.

"The Court. That is because some of these men have been in the penitentiary.

"Mr. David. That is true; and the defendant Flynn was in the penitentiary, and is out on parole, and wants to see witnesses.

"The Court. One of these men was out here and talked about employing counsel, a week or ten days ago, and I told him either to employ counsel or I would appoint counsel.

"Mr. David. I appreciate what you have said; but I understand the rule to be, under the Sixth Amendment, that a man is entitled to the assistance of counsel and that it means counsel of his own selection. I know that for many years the order has been in this Court that if a man does not have counsel and does not desire to employ one, the Court will appoint counsel for him. But here is a situation where the defendant Flynn is desirous of selecting his counsel; he wants to do that. He has two brothers in New York, and he tells me that they will cooperate with him if they are afforded an opportunity to confer.

"The Court. Then let them come down here. We cannot just turn the man loose.

"Mr. David. That is right.

&ast; &ast; &ast;

"The Court. I am not going to grant the continuance, because I do not think the reasons given are sufficient.

&ast; &ast; &ast;

"Mr. David. Your Honor, I should like to note an exception in behalf of this man. You understand I have not entered an appearance, and I speak as his friend and the friend of the Court. His point is that he is entitled, under the Sixth Amendment of the Constitution——

"The Court (interposing.) Well, he has been talking to you for three weeks; and you say he has just retained you for a certain thing——

"Mr. David. I think you are mixing him up with this defendant Rubin. There are four of them here, and I think you are referring to one of the defendants whose name is Rubin.

"The Court. Very well.

"Mr. Tarver. All defendants have been here for two months.

"Mr. David. The point is that under the Sixth Amendment he is entitled to the assistance of counsel of his own selection, and he should be afforded a reasonable opportunity to engage counsel—this case having been set down rather quickly. He has not had an opportunity to go fully into the case with me, and he has not been able to have his witnesses summoned or to have depositions of the witnesses taken, for the purpose of presenting his defense.

"The Court. Very well, sir.

"Mr. Tarver. This case is being reported; and since exceptions have been taken from your Honor's rulings, I should like the facts to appear in the record, which are that these four defendants were brought to Washington two months ago; that Mr. Solomon has been engaged by Mr. Neufield for more than a month, because he called at my office at the time. Mr. John P. Mullen called at my office at least a month ago and stated he represented Flynn. Mr. David called at my office a week ago and said that he had been employed by Flynn for the purpose of getting a reduction of bond.

"Mr. David. Only that and not generally employed.

"The Court. I understand, and you have your exception.

* * *

"(Following a brief pause.)

"The Court. Mr. David, will you remain, please.

"Mr. David. I have had no opportunity to talk to the defendant. I shall be downstairs.

"The Court. Very well.

* * *

"The Court. Bring the defendants up.

"(Thereupon the defendants were brought before the Court and took seats near the counsel table.)

"Mr. David. May I talk to the defendant Flynn for a minute?

"The Court. Yes. If you want to talk to him I will take a short recess.

"Mr. David. May I talk to him in the other room?

"The Court. Yes, sir.

* * *

"Mr. David. Your Honor, I should like to say that I had a short talk with the defendant Flynn, and he tells me that he has some witnesses to assist him in this case— his brothers, one of whom would come down here. He showed me a letter from his brother, saying that the notice is so short that he could not get here unless he had a little continuance in the case so that he could come down and confer with counsel.

"A man was trying to reach me yesterday afternoon, on long distance—a friend of this defendant. I was out of my office, and was in the courthouse most of the afternoon. When I got back to the office about 5:30 the long distance operator said that a man was trying to reach me from New York. I said that he could reach me at my home last night. About 7 o'clock this man called me and said that he was a friend of the defendant Flynn and would like to come down here or get his brother to come down and confer about this case, to assist this defendant and to get the names and addresses of his witnesses. I told him that the case was set down, as I understood it, for trial today. He said that was too short and he could not help him.

"This defendant tells me that if given an opportunity to have some lawyer of his own selection to listen to the circumstances connected with this case and make the necessary investigation and prepare for trial, then he can present his defense; but if he is forced to trial this morning, he is helpless and will have to hobble along the best way he knows how.

"Now, your Honor, he can make that statement to you, himself; but I have spoken to him for ten or fifteen minutes here, and I believe that the case ought to be investigated by counsel—I mean for a short time; I do not mean for a long delay.

"The Court. You had ample time to investigate the case; and if he has not obtained counsel of his own selection, it is his own fault.

"Mr. David. Well, all we can do is to note an exception on the record.

"The Court. I understand.

"Mr. David. You might have to take some depositions in this case, if we cannot get the witnesses.

"The Court. Very well; we shall proceed until the time comes. Are you representing him?

"Mr. David. No, sir; he has not employed me.

"The Court. But are you representing him?

"Mr. David. No, sir.

"The Court. Well, the Court appoints you to represent him.

"Mr. David. I take an exception; and I want to say that I have not had an opportunity to prepare, in this, to represent him.

"The Court. Well, you have been talking to him for several weeks.

"Mr. David. Well, I was sent for on the 8th of November.

"The Court. You were in my office three weeks ago.

"Mr. David. Well, I was sent for on the 8th of November.

"The Court. Very well."

The bill of exceptions also shows that during the trial David had the cooperation of Solomon, counsel for Neufield, who, as above stated, had been acting as such since September 21, 1939, and of Tedrow, who had been representing Foley since some time in the summer of 1939, and of Miller, counsel for Rubin. It shows further that David took an active, if not the leading, part, among counsel, in the conduct of the defense, and that he conducted the defense competently. The record shows no request during the course of the trial for the

taking of the depositions which David had said might have to be taken if the witnesses could not be obtained.

We think that in the denial of the Flynn motion for a continuance the trial court committed no prejudicial error. This motion, founded upon the guarantee of the Sixth Amendment of compulsory process and also upon the guarantee of the same Amendment that the accused "shall enjoy the right * * * to have the Assistance of Counsel for his defence," emphasized the points that the appointment of David to defend the case proper on the morning when it was called for trial gave no opportunity for conference with Flynn or for the obtaining of witnesses; that Flynn should have been allowed to choose his own counsel. Reliance is had upon Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Thomas v. District of Columbia, 1937, 67 App.D.C. 179, 90 F.2d 424.

▆ Johnson v. Zerbst, recognizing the vigor of the guarantee of the Sixth Amendment that in criminal prosecutions, "the accused ... shall enjoy the right to have the assistance of counsel," holds that if an accused is not represented by counsel and has not intelligently and competently waived his constitutional right thereto, the guarantee will stand as a judicial bar to a valid conviction. Powell v. Alabama points out that the guaranteed right to the assistance of counsel includes a fair opportunity to an accused to secure counsel of his own choice and to have the effective and substantial aid of counsel, and also decides that the failure of a trial court to make an effective appointment of counsel is a denial of due process within the meaning of the Fourteenth Amendment. Thomas v. District of Columbia recognizes for this jurisdiction that under the Sixth Amendment and the due process clause of the Fifth Amendment the assistance of counsel means effective assistance. But on their facts these cases are distinguishable from the instant case and they are therefore not controlling. In Johnson v. Zerbst the defendants had no counsel whatever at the trial. In Powell v. Alabama the defendants, negroes, accused of rape, a capital offense in the state of Alabama, were shown by the record to be youthful, ignorant and illiterate; they were tried under circumstances of public hostility and under the close surveillance of military forces, and were put on trial within a few moments after counsel for the first time charged with any degree of responsibility began to represent them. The case holds that "in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case."[4] In Thomas v. District of Columbia the defendants were in effect forbidden witnesses and denied the right of argument by counsel.

▆ So far as concerns the point that Flynn should have been allowed to choose his own counsel: It was not made to appear that at any time other than the moment of the motion for continuance Flynn had made application to be allowed to choose counsel and that his application was denied. And it was not made to appear that he was ignorant of his right to counsel or that he was unable to secure counsel. On the contrary it appears from the record that he knew of his right to counsel and that he was able to secure counsel, since he was at one time represented by Mullen—at least temporarily—and had retained David for a special purpose. An accused aware of his right to counsel and able to obtain counsel himself cannot over an extended time—in this case from September 21, 1939, until November 15 following, a period of approximately eight weeks—omit to take any steps either towards himself retaining counsel for the trial proper or towards securing an appointment by the court and then—at the moment of commencement of trial—properly complain that unless a continuance is granted in order that he may select counsel he will have been denied the right of choice. Flynn, aware of his right to counsel and able to obtain counsel, simply did not exercise his right of choice of counsel for the trial proper. In these circumstances the trial judge was confronted with the alternatives of delaying the trial, of

---

[4] 287 U.S. at page 71, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527.

proceeding so far as Flynn was concerned without counsel, or of appointing counsel. It cannot be said that he abused his discretion by adopting the last alternative.

▮ So far as concerns the point that the appointment of David to defend the case proper was made only on the morning when the case was called for trial: The trial judge could properly conclude that David knew something of the merits of the case although he had been retained for a special purpose, because in David's statement set out above—"I do not know very much about the merits"—David implied that he knew something. But assuming in Flynn's favor that David had had no opportunity for a conference with Flynn in preparation of the defense or to determine whom to call as witnesses, still, in all of the circumstances of the case, we cannot say that there was prejudicial error. As stated above, the record shows that David's defense of Flynn was competent and shows also that throughout the trial he had the assistance of Solomon, who had been counsel for Neufield since the time of his arraignment, and of Tedrow, who had been counsel for Foley since sometime during the summer preceding the trial. These two lawyers had had ample time to acquaint themselves through their own clients, who were jointly charged and tried with Flynn, with the circumstances surrounding the crime, and with possible items of evidence and witnesses available in defense. Also, as above stated, David had the assistance throughout the trial of Miller, counsel for Rubin. Further, on Flynn's motion for a new trial, there was no particularization of any way in which his defense could have been presented more adequately had a continuance been granted and another lawyer selected. In the course of the two days which the trial occupied—November 15 and 16—and during the period between the close of the trial and the filing of the motion for new trial, on November 20, 1939, there must have been opportunity for David to confer with Flynn concerning the case as a whole and concerning possible favorable witnesses; yet in the motion for new trial no mention was made of testimony available but not obtainable because of the refusal of the continuance or because some lawyer other than David might have been better able to develop it.

The quotations from Avery v. Alabama, supra, set forth at the conclusion of our discussion above of the Neufield motion for new trial are equally appropriate in respect of the Flynn motion.

▮ In the defendants' brief it is suggested that the court should have appointed counsel for Flynn on the arraignment. This is apparently in aid of the argument that there was not adequate time for David to prepare Flynn's defense—that Flynn ought to have had counsel at an earlier time. No error was in terms assigned in respect of any omission by the court to appoint counsel for Flynn on the arraignment. The contention is inconsistent with the proposition mainly relied on—that Flynn should have been allowed to select his own lawyer. All that the record of the arraignment, as corrected by stipulation filed in this court, shows is that Flynn appeared *in propria persona.* We bear in mind the statement of the Supreme Court in Johnson v. Zerbst that: "While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record." (304 U.S. at page 465, 58 S.Ct. 1019, 82 L.Ed. 1461) But there has been no contention whatever in this case that any waiver of counsel at the time of the arraignment was not intelligent and competent. And we do not understand it to be the law that we must presume that the court did not perform its duty at the arraignment.

## II

The motion by Neufield for compulsory process against Spencer Waldron. The bill of exceptions shows the following:

"Mr. Solomon. I was advised a few moments ago that six or seven years ago a defendant by the name of Waldron, I think they said, pleaded guilty to this offense and was sentenced by your Honor to fifteen years.

"Mr. Tarver. Spencer Waldron, who was sentenced to five years in each of the cases.

"Mr. Solomon. I do not know where the defendant is now.

"Mr. Tarver. He is in Alcatraz.

"Mr. Solomon. I was going to ask your Honor to bring him here. My client says he does not know him and never had anything to do with it.

"The Court. If you want men here, you want the application made seasonably.

"Mr. Solomon. Well, I did not know it until this morning.

"The Court. I understand; and you may find something else during the trial. The motion is overruled.

"Mr. Solomon. May I have an exception?

"Mr. Tarver. May I state that his client knew it in 1934, because I have a letter from the defendant at that time, stating that.

"Mr. Solomon. Well, the Government can bring him on, and we cannot.

"The Court. I understand.

"Mr. Solomon. Your Honor will not issue an order for him?

"The Court. No; I will not.

"Mr. Solomon. May I have an exception?

"The Court. No; I understand he is in Alcatraz."

 In support of this motion the guarantee in the Sixth Amendment of compulsory process for obtaining witnesses in an accused's favor is again relied upon. Although not formally designated as such by counsel, this motion was one, in effect, for the issuance of a writ of *habeas corpus ad testificandum*, the common law writ for the production of witnesses who are confined in jail and who are thus beyond the reach of the ordinary subpoena. The issuance of such a writ was at the common law discretionary. 8 Wigmore, Evidence (3d ed., 1940) 110; 1 Greenleaf, Evidence (16th ed., 1899) 473; In re Thaw, 3 Cir., 1908, 166 F. 71, Ann.Cas.1915D, 1025. And it has been held in the Federal courts that the issuance of all compulsory process is discretionary where the production of the witness is sought at Government expense. Goldsby v. United States, 1895, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed. 343; Crumpton v. United States, 1891, 138 U.S. 361, 11 S.Ct. 355, 34 L.Ed. 958; Gibson v. United States, 8 Cir., 1931, 53 F.2d 721; Austin v. United States, 9 Cir., 1927, 19 F.2d 127; Dupuis v. United States, 9 Cir., 1925, 5 F.2d 231. Although Neufield has filed in this appeal an affidavit *in forma pauperis*, since the record of the proceedings below does not show that the production of Spencer Waldron was to be at Government expense we will make the somewhat strained assumption in the defendant's favor that he was able and expected to pay the cost of the transportation of Waldron and a neces-

sary guard or guards. But we think that even under this circumstance the issuance of the writ was discretionary, that the guarantee of the Sixth Amendment is not so absolute as to require the production of a witness despite an unseasonable application for the writ. For the due administration of justice there must be a limit to delay; and if the right to the writ for the production of a jailed witness were absolute in the sense that the writ must be issued and executed whenever demand is made, it would be within the power of an accused to compel a continuance by making a late demand. We think it was permissible for the trial judge to take it, from what the record shows was said to him, that Neufield had known since 1934 of Waldron's plea of guilty and sentence; certainly the judge was not bound to disbelieve the undenied statement of the District Attorney to that effect; and the judge knew also from the record before him that Neufield had had representation by Solomon, since the time of his arraignment on September 21, 1939. Therefore the trial judge properly regarded the application for process against Waldron as unseasonable. An accused cannot omit to inform his lawyer during an extended period—in this case approximately eight weeks—before trial of the existence of a possible material witness and then successfully charge the trial judge with an abuse of discretion for refusing a demand for the production of the witness not made until the moment the case is called. While in the usual course it would seem important to have present at the trial a confessed participant in the crime charged, we can not say that under the circumstances of the instant case the trial judge abused his discretion in denying the application for Waldron's production.

### III

The motion for a directed verdict. This motion, made at the close of all the evidence, raised, so far as it is argued on the appeal, two points. The first asserts failure of the evidence to prove with sufficient particularity that the money taken was of the character referred to in the indictment; the second, that the proof is insufficient to sustain the charge in the indictment that the money was taken from the possession of the teller Elgin.

First. Section 362, title 6, D.C.Code (1929), 31 Stat. 1338 (1901), provides as follows:

"Description of Money.—In every indictment, except for forgery, in which it is necessary to make an averment as to any money or bank bill or notes, United States Treasury notes, postal and fractional currency, or other bills, bonds, or notes, issued by lawful authority and intended to pass and circulate as money, it shall be sufficient to describe such money, bills, notes, currency, or bonds simply as money, without specifying any particular coin, note, bill, or bond; and such allegation shall be sustained by proof that the accused has stolen or embezzled any amount of coin, or any such note, bill, currency, or bond, although the particular amount or species of such coin, note, bill, currency, or bond be not proved."

The defendants argue thus: While under this statute the Government was not required to allege in the indictment more than the mere taking of "money," without specifying any particular coins, notes, bills, currency, or bonds, as would have been required in the absence of this statute, the Government is not relieved from the duty of proving that what was taken was some coin or coins, notes, bills, currency or bonds issued by lawful authority of the United States or of some other country, or from the duty of proving that what was taken had value; and the evidence in the case fell short of satisfying this duty. The witnesses described what was taken merely as "money" or "dollars." In support of their contention the defendants cite the following cases: United States v. Hardyman, U. S. 1839, 13 Pet. 176, 10 L.Ed. 113; United States v. Klintock, U. S. 1820, 5 Wheat. 144, 5 L.Ed. 55; Alderman v. State, 1925, 88 Fla. 375, 102 So. 737; Keating v. People, 1896, 160 Ill. 480, 43 N.E. 724; Hamilton v. State, 1877, 60 Ind. 193, 28 Am.Rep. 653; State v. Segermond, 1888, 40 Kan. 107, 19 P. 370, 10 Am.St.Rep. 169; Merrill v. State, 1871, 45 Miss. 651; State v. Neilon, 1903, 43 Or. 168, 73 P. 321; McCaskey v. State, 1915, 76 Tex.Cr.R. 255, 174 S.W. 338; Early v. State, 1909, 56 Tex. Cr.R. 61, 118 S.W. 1036; Snelling v. State, 1909, 57 Tex.Cr.R. 416, 123 S.W. 610; Perry v. State, 1901, 42 Tex.Cr.R. 540, 61 S.W. 400; Otero v. State, 1891, 30 Tex.App. 450, 17 S.W. 1081; Lewis v. State, 1889, 28 Tex.App. 140, 12 S.W. 736; Lavarre v. The State, 1877, 1 Tex.App. 685; State v. Phillips, 1902, 27 Wash. 364, 67 P. 608; State v. Robison, 1930, 109 W.Va. 561, 155 S.E. 649.

We find none of the cases cited of persuasive value for the reason that they are not decided under such a statute as Section 362. And we think that it is obvious upon the face of Section 362 that its purpose was to relieve the Government from the necessity of detailed particularization, in either allegations or proof, of the money taken. Therefore it was not necessary for the Government in this case either to describe in detail in either the indictment or the proof the number of coins, bills, notes, items of currency or bonds taken or the face value of each or the date of issue or the numbers thereof or other special identifying features.

The indictment charged the defendants with taking "a certain sum of money, to wit, nine thousand and twenty-one dollars in money, of the value of nine thousand and twenty-one dollars, of the money and property of the Washington Mechanics Savings Bank, a body corporate . . . ." Elgin, the teller, after describing the holdup, testified: "Later I ascertained money was missing. We immediately settled the cages. I settled my own and found $3,302 missing. Approximately $9,030 was missing throughout the bank." Again he said: "On June 10, 1932, after I counted my money I found out that $3,302 was missing from my cash drawer . . . . A total of $9,000 was missing from the bank." And again: "The deficit in my drawer was $3,304.23 . . . . In the shape of cash." Davis, the assistant cashier, testified: "After the occurrence at the bank we checked up and ascertained how much money was missing, which was $9,030.36, which belonged to the bank." Richard S. Sanderson, who at the time of the robbery was bookkeeper and auxiliary teller of the bank, testified as follows: "After the occurrence I checked my accounts and found that $1,260 was missing from my drawer, I believe or something like $1,260.90." The evidence showed also that at the time of the robbery the bank was an operating concern in the District of Columbia. A jury is entitled to draw reasonable inferences from the facts proved and to take language at its ordinary meaning. In this case, knowing from the evidence that the bank was an operating bank in the District in the year 1932, the jury could reasonably infer that the tellers' "cash drawers" were not filled with wampum or seashells, historic symbols of exchange, or with objects of barter; and

the jury could take the words "money," "cash," and "dollars" to mean what they ordinarily mean in the context of business in the District—money or currency issued by lawful authority and intended to pass and circulate as such, and to mean money having value. To the effect that "money" in common parlance means money of the United States see: State v. Gabriel, 1938, 342 Mo. 519, 116 S.W.2d 75; Guyon v. State, 1921, 89 Tex.Cr.R. 287, 230 S.W. 408; Colter v. State, 1897, 37 Tex.Cr.R. 284, 39 S.W. 576. People v. Fiereto, 1922, 303 Ill. 186, 135 N.E. 417, holds that the term "money" itself imports value.

Second. Particularizing their second point, the defendants urge that the motion for a directed verdict should have been granted: "Because the evidence . . . disclosed that the money referred to in the indictment was [at the time of the robbery] . . . in the legal possession of the . . . Bank, a body corporate, or in . . . Davis, the Manager and Assistant Cashier . . . of the . . . branch bank, and that . . . Davis was . . . in charge of all of the assets of the . . . branch bank"; and "Because there is a failure of proof tending to sustain the allegation [that] . . . the defendants did steal, take and carry away the money . . . from and off the person and from the immediate actual possession of . . . Elgin"; and "Because the evidence is insufficient to go to the jury that . . . Elgin was in possession of the money and assets of the . . . Bank, a body corporate, at the time of the commission of the offense . . . .."

According to the evidence in the case: Elgin was a paying and receiving teller in the bank at the time of the robbery. $3,304.23 of the total amount taken was removed from his cash drawer, the remainder from the cash drawers of the other tellers. It was the custom at the bank for Davis, assistant cashier and officer in charge of the branch, to open the vault in the morning. Elgin had the combination to the vault and could open it, but it was not part of his duties to do so. Each teller, as he arrived in the morning, would go to the vault and take from it his cash box and place the money it contained in a drawer under the counter. Each teller had separate compartments in the vault, which were kept locked, and the money each teller handled was returned at night by him to his separate vault compartment. Each teller was responsible for his own money, and the money in the drawer of each teller could be handled only by him. Davis could adjust the money according to the needs of the tellers. All the money in the bank, including that in Elgin's drawer, belonged to the bank. The charge in the indictment was that the defendants took "from and off the person, and from the immediate, actual possession of . . . Elgin, then and there being, a certain sum of money, to wit, nine thousand and twenty-one dollars in money, of the value of nine thousand and twenty-one dollars, of the money and property of the Washington Mechanics Savings Bank, a body corporate . . . .."

The point made by the defendants is not that the robbers did not take the money from Elgin's drawer, but that, under the facts above set forth in respect of the practice in the bank and the duties of the tellers, the money in Elgin's drawer was not, as a matter of law, in his possession but was in that of the bank or of Davis, the officer in charge of the branch. The defendants cite no authority for their position except White v. United States, 1936, 66 App.D.C. 102, 85 F.2d 268, and 36 Corpus Juris 834. The text of the latter says: "Since a servant, clerk, or employee of a minor grade, who has merely the care of his employer's goods, or who performs some service in respect to them under his employer's immediate supervision, is usually held to be merely the custodian of the goods, the ownership must be laid in his employer and not in him. But an employee, of a higher grade, who has the entire care, management, and control of chattels intrusted to him by his employer, such as the manager of a ranch or herd of cattle, the cashier of a bank, an agent in charge of a shop and stock of goods for sale, a real estate agent in charge of a house, or an agent for the sale of goods, or who, as agent of his employer, is authorized to receive goods consigned to him, or to collect moneys owing to him, or one who is the agent and representative of a common carrier in respect to goods delivered to the carrier for transportation, such as a station agent or yardmaster of a railroad, or a driver of a stagecoach, is usually held to have such possessory rights in the chattels as justifies the laying of the ownership in him, and especially is this the case when

the employer is a corporation which cannot act except through its agents, or when the employer never had possession of the chattel independently of the agent." This text statement has to do with the question in whom ownership must be laid in an indictment for larceny. It does not have to do with the question of possession in larceny, and does not have to do with robbery at all. It is therefore of no force in the present case. In White v. United States the indictment charged that White by force and violence stole and carried away from the person of one Frank M. La Porte $1,-217.05 in money belonging to the Riggs National Bank. In several counts it was stated that the money belonged to the bank and that it was in the care, custody, control, and possession of the bank. The statute under which the indictment was drawn provided: "Whoever, by force and violence, or by putting in fear, feloniously takes, or feloniously attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank shall be fined not more than $5,000 or imprisoned . . .." 48 Stat. 783 (1934) 12 U.S.C.A. § 588b (a). The evidence showed that La Porte was employed by the Riggs Bank as an assistant in the mailroom and as a messenger. His duties took him to the Post Office to cash money orders and to the Union Station to collect deposits, the money from which he placed in a bag which he carried. He was held up as he came out of the Union Station and the bag with its contents was taken from him. White was convicted, and on appeal his principal contention was that it was not proven that the money alleged to have been stolen was the property of the Riggs National Bank. This court held that the contention could not be sustained. It said: "The testimony disclosed that . . . La Porte was an agent employed by the bank, to collect and receive the money as the property of the bank; that at the time of the robbery the money was in La Porte's possession, control, and custody in that capacity for the bank. These facts, together with the assault committed upon La Porte, clearly bring the case within the terms of the Act . . .. It is, of course, plain that the money while in the care, custody, and control of the messenger was, in contemplation of law, in the custody, care, and control of the bank." 66 App.D.C. at page 104, 85 F.2d at page 270.

Therefore White v. United States is of no aid to the defendants. The statute under which it was decided is materially different from the one applicable in the instant case, which, denouncing robbery as a crime, provides: "Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take *from the person or immediate actual possession of another* anything of value, is guilty of robbery . . . ." (Italics supplied)

We think that the word "possession" in this statute is not used in the strict larcenous sense, as a result of which, although custody or control may be in a servant or agent, legal possession is said to be in the master. Larceny is an offense against the possession; robbery, against the person. The local robbery statute in our view uses the word "possession" in a colloquial sense, meaning nothing more than custody or control. See as persuasive on this topic Barfield v. State, 1939, 137 Tex.Cr.R. 256, 129 S.W.2d 310, 123 A.L.R. 1093, 1099; Brooks v. The People, 1872, 49 N.Y. 436, 10 Am.Rep. 398; Rasberry v. State, 1909, 4 Okl.Cr. 613, 103 P. 865; Reese v. State, 1922, 91 Tex.Cr.R. 457, 239 S.W. 619. The proof showed a taking from the immediate, actual possession, in this sense of the term, of Elgin, and that was charged in the indictment. There was, therefore, no variance.

IV

The request for a view. The defendants contend that the court erred in refusing to permit the jury to view the scene of the robbery—the building in which the bank was located and the vicinity thereof—particularly because of the testimony of the witness Mrs. Sarah E. Randolph that she was seated in a parked automobile in front of the bank and through the window of the same saw the robbery. It was urged upon the trial court that the jury should be given an opportunity to verify the witness' statements that she could see through the window.

The granting or refusal of a motion for a view is within the discretion of the trial judge and reviewable only for abuse. Massenberg v. United States, 4 Cir., 1927, 19 F.2d 62; 4 Wigmore, Evidence (3d ed., 1940) 277. Photographs introduced in evidence in the case pictured both the outside and inside of the bank. With these in evidence the trial judge may well have thought

a view quite unnecessary. There is no showing of an abuse of discretion.

## V

The motion for arrest of judgment. Under this motion the defendants raised three points: first, that the indictment fails to show what relationship, if any, Elgin, the person from whom the money was charged to have been taken, sustained to the bank averred to be the owner of the money; second, that the indictment fails to charge *directly* that the resistance was by Elgin, or that Elgin was put in fear, or that the sudden and stealthy seizure and snatching was from Elgin, or that any act of force and violence was committed upon Elgin, or that Elgin was assaulted, and that the indictment fails to allege *directly* the essential elements of robbery; third, that the indictment is bad because it contains elements not within the terms of the robbery statute.

 First. The theory of the defendants under the first point apparently is that it was necessary to charge in the indictment that Elgin was the servant of the bank so that it would appear from the averments that his possession was lawful. The point is not supportable. Under the allegation of the indictment that the defendants took from the possession of Elgin money and property of the bank, it will be presumed that Elgin's possession of the money and property was lawful; that is to say, that is what, by fair intendment, the indictment charges. Vane v. United States, 9 Cir., 1918, 254 F. 28; Danzey v. State, 1900, 126 Ala. 15, 28 So. 697; People v. Dean, 1924, 66 Cal.App. 602, 226 P. 943; Welch v. State, 1924, 195 Ind. 87, 143 N.E. 354. We do not by the foregoing rule that taking from one whose possession is unlawful would not be a crime. That point is not presented.

 Second. Examination of the indictment, which is set out *in haec verba* at the outset of this opinion, shows that the defects which the defendants complain of under their second point are defects of form, not of substance. The complaint is against indirect averments. Such defects come within the rule of intendment—that a verdict will aid the defective statement of a cause, though not the statement of a defective cause. 1 Chitty, Pleading (16th Amer. ed., 1876) 854; Keigwin, Cases on Criminal Procedure 511 (1939). Such defects are also rendered innocuous by U.S. C.A. title 18, section 556, Rev.Stat. § 1025 (1872), providing that: "No indictment . . . shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant." By no possibility could it have been held by the trial judge that the defendants were prejudiced by the formal defects complained of. Also such defects are within U.S.C.A. title 28, section 391, Rev.Stat. § 726 (1789), 36 Stat. 1163 (1911), 40 Stat. 1181 (1919), providing that: "On the hearing of any appeal . . . in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." We cannot say, after an examination of the entire record, that the defendants' substantial rights were in any manner affected by the formal defects they attack. The matter charged to have been indirectly rather than directly alleged was, in the words of Lord Ellenborough in Jackson v. Pesked, 1813, 1 M. & S. 234, stated in terms sufficiently general to comprehend it in fair and reasonable intendment." And see Rosen v. United States, 1896, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606; 1 Chitty, op. cit. supra, at 845. The defendants were adequately informed by the indictment of the essentials of what they were charged with.

Third. The defendants assert that the local statute denouncing robbery as a crime and providing for its punishment, does not itself express all of the elements of the crime of robbery at the common law since it omits the requirement that the property shall belong to someone other than the robber and the requirement that the property shall be stolen. And the defendants contend that it is not permissible to draw an indictment in terms broader than the statute. Therefore they say that the allegations of the indictment in the instant case that the money taken from Elgin was the property of the bank, and that it was stolen, must be disregarded, and that in consequence the indictment "in effect, charges no greater crime than grand larceny, and . . . is insufficient to support a conviction of robbery." Hence, say the defendants, the conviction of robbery cannot be upheld.

390

■ For the proposition that the robbery statute does not enumerate all of the elements of the crime of robbery at common law, the defendants rely upon United States v. Ernest Parker, Sup.Ct.D.C., 1906, 35 Wash.L.Rep. 6. In that case the trial court, speaking through Mr. Justice Stafford, said that the local robbery statute, which was phrased then as it is now, "did not undertake to state a full definition of the crime to which it referred, but to enlarge somewhat the definition of robbery at common law in respect to the manner of the taking. The legislature said nothing in regard to the ownership of the property taken, nor the intent with which it was taken . . . ." 35 Wash.L.Rep. at page 6. But the indictment in that case supplied these elements in its averments, and as thus drawn the indictment was sustained, the point actually ruled on in the case being that it was not necessary to use the word "felonious" in the indictment. The defendants cite the case only for the proposition that the local statute omits to enumerate all of the elements of robbery. They attack the proposition that the missing elements may be supplied by the indictment. They cite nothing for their position except cases announcing the rule that penal statutes must be strictly construed. United States v. Resnick, 1936, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127; Fasulo v. United States, 1926, 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443; United States v. Wiltberger, U.S. 1820, 5 Wheat. 76, 5 L.Ed. 37; Respublica v. Weidle, Pa. 1781, 2 Dall. 88, 1 L.Ed. 301. But the last three of these cases themselves recognize that although there is a rule that penal laws are to be construed strictly, nevertheless there is also a rule that they are not to be construed so strictly as to defeat the obvious intent of the legislature.

■ The position taken by the defendants is not the law. Where statutory language imports less than the framers of the legislation intend—in which case the effect of the enactment must be determined not altogether by the literal sense, but as well by the accepted principles of interpretation—an indictment must and may allege all of the facts which the language implies as requisite to constitute the crime denounced. Keigwin, op. cit. supra, 402–3. The obvious purpose of the Congress in enacting the robbery statute in the instant case was, as said by Mr. Justice Stafford in United States v. Ernest Parker, to expand the common law definition of robbery so that it would comprehend the taking by sudden or stealthy seizure or snatching; but also the Congress obviously meant to make robbery a crime, and by robbery it meant robbery in the usual common law sense of the term except as expanded. The law is settled that in such circumstances it is necessary, and therefore permissible, to overlap the statute in order to charge the crime. United States v. Carll, 1881, 105 U.S. 611, 26 L.Ed. 1135; Moens v. United States, 1920, 50 App.D.C. 15, 267 F. 317. In United States v. Carll an indictment for passing a forged obligation of the United States omitted to allege that the defendant knew the instrument uttered to be false. The statute, Rev.Stat. § 5431 (1878), 18 U.S.C.A. § 265, provided: "every person who, with intent to defraud, passes, utters, publishes, or sells any falsely made, forged, counterfeited, or altered obligation . . . of the United States, shall be punished . . . ." etc. In holding the indictment bad, the Supreme Court, speaking through Mr. Justice Gray, said:

"In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves, fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished; and the fact that the statute in question, read in the light of the common law, and of other statutes on the like matter, enables the court to infer the intent of the legislature, does not dispense with the necessity of alleging in the indictment all the facts necessary to bring the case within that intent. United States v. Cruikshank, 92 U.S. 542 [23 L.Ed. 588]; United States v. Simmons, 96 U.S. 360 [24 L.Ed. 819]; Commonwealth v. Clifford, 8 Cush. (Mass.) 215; Commonwealth v. Bean, 11 [Cush., Mass.,] 414; Commonwealth v. Bean, 14 Gray (Mass.), 52; Commonwealth v. Filburn, 119 Mass. 297.

"The language of the statute on which this indictment is founded includes the case of every person who, with intent to defraud, utters any forged obligation of the United States. But the offence at which it is aimed is similar to the common-law offence of uttering a forged or counterfeit bill. In this case, as in that, knowledge that the instrument is forged and counterfeited is essential to make out the crime; and an uttering, with intent to defraud, of an instrument in fact counterfeit, but supposed by the defendant to be genuine,

though within the words of the statute, would not be within its meaning and object." [105 U.S. at 612–613, 26 L.Ed. 1135]

█ Hence it was proper in the instant case for the Government to charge in the indictment that the money taken from Elgin was the property of the bank and that it was stolen, notwithstanding the fact that the robbery statute does not express the elements of common-law robbery that the property shall belong to someone other than the robber and that it shall be stolen.

### VI

It appears from the record that some part of the colloquy between counsel and the court in respect of the requested continuance of the case (discussed under topic I) took place in the presence of the jury panel, although before actual selection of the particular jury which was sworn to try this case. A minority view is expressed that the trial judge exhibited irascibility, impatience, and resentment, and that the District Attorney entered into this mood; and the position is taken that the manner and comments of the judge and of the District Attorney must so have prejudiced the jury as a whole as to vitiate the verdict.

The majority see no impropriety in the conduct of the District Attorney. He made only such statements as were necessary to his representation of the Government against what he apparently believed was an unwarranted attempt to secure delay.

The record does show abruptness on the part of the trial judge—perhaps even impatience. This may have been occasioned by a belief that the motions for continuance were for delay only. The majority do not justify abruptness or impatience on the part of a trial judge. But the record in this case is devoid of any contention by any of the four lawyers representing the defendants at the trial or any of the three representing them on this appeal that the conduct of the judge—or of the District Attorney—prejudiced the jury and thus vitiated the verdict. There is no charge in the record that any of the lawyers representing the defendants were not experienced and competent, and it is not to be assumed that such counsel would have omitted prompt and vigorous steps to protect the defendants against exposure to a verdict by a prejudiced jury had they believed there was any foundation for a charge of prejudice.

█ A plain error may, of course, be noticed, especially in a criminal case, even though not assigned. But, fully cognizant of the duty of courts to protect the rights of defendants in criminal cases, the majority are nevertheless of the view that under the circumstances of this case, it would be quite unwarranted for the court on its own motion to reverse because of the remarks of the trial judge or of the statements of the District Attorney—in the colloquy in question.

We find none of the defendants' points urged on the appeal meritorious. In consequence the judgment of conviction is affirmed.

MILLER, Associate Justice.

I concur in the majority opinion except as to points I and II. As to them I dissent. The Supreme Court has warned repeatedly against arbitrary action in the trial court which deprives accused persons of due process of law.[1] One of the important guarantees of fair trial, as provided in the Sixth Amendment, is that an accused person shall enjoy the right "to have compulsory process for obtaining witnesses in his favor." This right includes a reasonable time in which to procure witnesses; and it has been held that refusal by the court to grant a continuance so that certain witnesses could be summoned was an abuse of discretion and a denial of the right guaranteed by the Constitution.[2]

Appellant Neufield, in whose behalf request was made for a continuance, had been incarcerated in Sing Sing Prison. Seven and one-half years had elapsed during which he had been out of touch with his friends, acquaintances, and the rest of the world. Approximately two months before the trial in the lower court, he had been released on bail. Eight days before trial he received notice of the trial date. He and his counsel spent four days searching for witnesses, with the aid of process servers and a private detective. They had failed so far, but assured the court that within two weeks they could find them and be ready for trial. The lower court arbitrarily refused the request. No occasion for such haste appears

---

[1] Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461; Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. 84 A.L.R. 527.

[2] Paoni v. United States, 3 Cir., 281 F. 801.

in the record. The Government, for seven and one-half years, had every facility for keeping in touch with its witnesses; the accused had none. But the fact that he spent those years in a penitentiary and came out only two months before trial, stripped, by prison discipline, of the initiative which might have made him more alert in protecting his own interests, does not deprive him of the presumption of innocence or of any right guaranteed by the Constitution.[3] Neither was there any showing of bad faith upon his part. He had waived extradition; he had asked for no previous stay; he apparently was cooperating with the Government in every proper way. It would seem that the Government should have been active to insure to him full enjoyment of his constitutional rights, and the court zealous to preserve them for him. His request was a reasonable one and certainly not unusual in trial court practice. This action, together with others hereafter discussed, constituted, in my opinion, an abuse of discretion.

With regard to the court's refusal to issue an order for the witness Waldron, the constitutional right to obtain witnesses makes it the duty of the court, upon application of a prisoner, to send for such witnesses, wherever they may be had within the jurisdiction of the court, and at the expense of the Government, if the prisoner proves that he is poor and unable to bear the expense himself.[4] The court neither inquired, nor did it permit a showing, as to whether the accused could bear such expense.

If the order had issued as requested the desired witness could have been produced within four days. Counsel stated that he had just been advised of the availability of the witness; that Waldron was a material witness cannot be questioned; that he was unavailable to the accused without such an order is apparent because of the rigid discipline of the federal prison administration over prisoners incarcerated at Alcatraz. Under the circumstances it is difficult to see in what respect the application was unseasonable. The fact that the witness was at Alcatraz—in Government custody—would seem to argue in favor of the application rather than against it.

A second important guarantee of the Sixth Amendment is that an accused shall enjoy the right to have the assistance of counsel for his defense in cases involving noncapital offenses as well as capital offenses.[5] If this means anything it means intelligent, prepared[6] and effective assistance.[7] Although robbery is not a capital offense, it is nevertheless one of the most serious in character, and the rule is equally applicable. The record shows that appellant Flynn was still in jail up to the time of the trial. He, too, had been in the penitentiary, had been released on parole,

---

[3] Powell v. Alabama, 287 U.S. 45, 52, 53 S.Ct. 55, 58, 77 L.Ed. 158, 84 A.L.R. 527: "It was the duty of the court * * * to see that they were denied no necessary incident of a fair trial."

[4] United States v. Kenneally, 26 Fed. Cas. 760, No. 15,522.

[5] Bridwell v. Aderhold, D.C.N.D.Ga., 13 F.Supp. 253, 254, 255, aff'd. Bridwell v. Zerbst, 5 Cir., 92 F.2d 748, rev'd on other grounds, 5 Cir., 97 F.2d 992, because of decision in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461: "It will be observed that the guaranty of the right to assistance of counsel and compulsory process for obtaining witnesses is contained in the same clause and expressed in substantially the same language as the guaranty of the right to trial by jury. The amendment guarantees this right to the accused 'in any criminal prosecution.' There is no limitation of these rights to cases where the accused is charged with a capital offense, as urged by respondent, and no reason appears in logic, morals, or humanity why an accused, in danger of deprivation of his life or liberty, should, in any criminal prosecution, be deprived of these rights by implication. These are fundamental rights which the courts should safeguard with meticulous care and award to the accused, whether requested or not, unless waived by him in a manner showing his express and intelligent consent."

[6] Johnston v. Commonwealth, 276 Ky. 615, 622, 623, 124 S.W.2d 1035, 1038: "A request for a continuance of a trial is but a means to an end. The end is a fair trial. The rules by which such motion is to be measured are but secondary means. If their application, though apparently proper at the time, seems to have been unjust, or to have had disastrous result, the error ought to be corrected on the motion for the new trial. What should more profoundly concern the courts on review is whether the right end was achieved— whether there is justice in the verdict. If it appears there is not, the court should be sensitive to the situation and not permit the accused to be sacrificed on the altar of legal formalism, too literally applied."

[7] Thomas v. District of Columbia, 67 App.D.C. 179, 90 F.2d 424.

and was again in jail, on account of the present accusation.

Even the cold record[8] reveals irascibility, impatience and resentment upon the part of the trial judge, and that the Assistant District Attorney entered fully into his mood. But the record fails completely to reveal any reason therefor. Every request made by counsel was a reasonable one; the showing was ample for a continuance;[9] the perseverance of counsel in the face of judicial arbitrariness was commendable; and, in my opinion, the court's action constituted an abuse of discretion. As the Supreme Court has said: "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."[10]

We have said that: "The trial judge should be so impartial, in the trial of a criminal case, that by no word or act of his may the jury be able to detect his personal convictions as to the guilt or innocence of the accused."[11] Several statements of the trial judge, in the present case, some of which were made in the presence of the jury, were, in my opinion, clearly prejudicial, evidencing hostility to the accused and their counsel; and seriously calculated to prejudice the minds of the jurors against them. For example, his comment: "That is because some of these men have been in the penitentiary," was certainly not calculated to suggest impartiality. Moreover, this atmosphere of partiality and hostility was contributed to by the Assistant District Attorney;[12] apparently unrebuked by the court. In this regard attention should be called to his comment: "Mr. John P. Mullen called at my office at least a month ago and stated he represented Flynn." No opportunity was given Flynn—who, it will be remembered, was entirely unrepresented by counsel—to reply to this statement or to mitigate whatever effect it may have had upon the jury, as, for example, from the covert suggestion that the alleged Mullen had investigated and abandoned Flynn's defense. Attention should be called, also, to the statement made by the Assistant District Attorney: "May I state that his client [Neufield] knew it [Waldron's incarceration at Alcatraz] in 1934, because I have a letter from the defendant at that time, stating that." This statement was inadmissible in evidence for any purpose, in view of the fact that appellant did not testify in his own behalf. Although it was made out of the hearing of the jury, its effect upon the judge—intended, as it apparently was, to show acquaintance between the accused and a man who had pleaded guilty to the same offense—was reflected in the court's curt responses to counsel's request for an order to produce the witness, which followed immediately the statement volunteered by the Assistant District Attorney:

"Mr. Solomon. Your Honor will not issue an order for him?

"The Court. No; I will not.

"Mr. Solomon. May I have an exception?

"The Court. No; I understand he is in Alcatraz."

"While there is perhaps no single instance involving error so prejudicial as to warrant reversal, we are convinced that, considered as a whole, the rights of defendant were so prejudiced thereby as to deprive him of that fair and impartial trial which the Constitution and the law of the land accords to every citizen accused of the commission of crime."[13]

In my opinion the judgment should be reversed and the case remanded for a new trial.

---

[8] Avery v. Alabama, 308 U.S. 444, 447, 60 S.Ct. 321, 322, 84 L.Ed. 377: "But where denial of the constitutional right to assistance of counsel is asserted, its peculiar sacredness demands that we scrupulously review the record."

[9] Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377: "But the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment."

[10] Powell v. Alabama, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158, 84 A.L.R. 527.

[11] Egan v. United States, 52 App.D.C. 384, 397, 287 F. 958, 971.

[12] See Berger v. United States, 295 U. S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314; Allen v. United States, 9 Cir., 115 F. 3, 9.

[13] Egan v. United States, 52 App.D.C. 384, 397, 287 F. 958, 971.